IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) ) ) | |
| Plaintiff, ) ) | CIV. ACTION NO. |
| v. ) ) | 08-cv-01439-AGF |
| WAL-MART STORES, INC., ) ) ) | |
| Defendant. ) | |

**PLAINTIFF EEOC'S MEMORANDUM IN OPPOSITION
TO DEFENDANT WAL-MART STORES, INC.'S
MOTION FOR SUMMARY JUDGMENT**

In 2005, Wal-Mart terminated Yvonne Loskot because she was "too old" and could be replaced with "two younger people". When Loskot sought unemployment benefits, Wal-Mart said it had fired her because her grandchildren had participated in a charity program sponsored by the company. When Loskot sought help from the EEOC, Wal-Mart again said that it had fired her because of the charity program. Half-way through the EEOC investigation, the company abandoned that justification and claimed that Loskot had a history of theft. Now, Wal-Mart seeks summary judgment against the EEOC and its claim of unlawful discrimination, asking this Court to accept any reason for Loskot's termination except her age. In doing so, Wal-Mart asks the Court to ignore the weight of the evidence and to make credibility determinations that are reserved for the jury. Wal-Mart's motion must be denied because the evidence in this case is sufficient to prove to a reasonable jury that Loskot's age was the "but-for" cause for the company's actions.

I. **AGE WAS THE "BUT-FOR" REASON FOR WAL-MART'S TERMINATION OF YVONNE LOSKOT.**

"The ADEA makes it unlawful for an employer to discharge an employee 'because of such individual's age.'" *Baker v. Silver Oak Senior Living Mgmt. Co.*, -- F.3d ----, No. 08-1036, 2009 WL 2914159, at *3 (8th Cir. Sep. 14, 2009). The Supreme Court recently held that the plaintiff's burden in an age-based disparate treatment claim is to "prove that age was the 'but-for' cause of the employer's adverse decision." *Gross v. FBL Fin. Serv., Inc.*, 129 S.Ct. 2343, 2350 (2009); *see also Baker*, 2009 WL 2914159 at *3 (acknowledging the Court's standard of proof in ADEA cases). This standard does not create a "heightened evidentiary requirement" for plaintiffs; rather, "the rule is simply that '[a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.'" *Baker*, 2009 WL 2914159 at *3, quoting *Gross*, 129 S.Ct. at 2351 n.4 and 2351. In this case, all of the evidence, from the District Manager's age-based comments regarding Yvonne Loskot and his attempts to get rid of her, to the company's sloppy investigation of Loskot and its changing reasons for her termination, demonstrate that age was the "but-for" reason for Yvonne Loskot's termination.

**A.   District Manager John Turner Wanted Yvonne Loskot Out of the Vision Center Because Of Her Age.**

In 2005, the year she was fired, Yvonne Loskot was a licensed optician in Wal-Mart's DeSoto, Missouri store, and she had worked in Wal-Mart Vision Centers for ten years. (Ex. A, Y. Loskot Dep. at 20:8-23.) She had known John Turner, the Vision Center District Manager, for approximately six or seven years, and she was 67 years old. ( Ex. O, Turner Dep. at 14:5-10, 19-21; Ex. A, Y. Loskot Dep. at 11:19-20.) Turner had been in the District Manager position for three years. ( Ex. O, Turner Dep. at 15:3-12) Loskot's immediate supervisor was Pam Black,

2

the DeSoto Vision Center Manager.  (Ex. B, Black Dep. at 40:3-7.)  Black had also worked in Wal-Mart vision centers for many years, and she was 50 years old.  (Ex. B, Black Dep. at 24:20-29:12; Ex. P, Black Assoc. History Profile.)

In May 2005, John Turner told Pam Black that Yvonne Loskot was too old and that Black could replace Loskot with two younger workers.  (Ex. B, Black Dep. at 87:13-88:8)  Turner made these comments during a discussion about reducing payroll costs in the DeSoto Vision Center.  (*Id*.)  Two weeks later, Turner told Black again that she should get rid of Loskot because she was getting old and could be replaced with two younger people.  (Ex. F, Black Affidavit; Ex. B, Black Dep. at 88:1-23.)  After Turner made these comments, Black told Yvonne Loskot that Turner had told her that she should terminate Loskot because she could be replaced with two younger employees. [1]  (Ex. A, Y. Loskot Dep. at 173:22-175:7.)  Black also told another vision center employee, Cindy Uhlinger, that Turner told her to get rid of Loskot.  (Ex. G, Uhlinger Interview.)  Black refused to get rid of Loskot, though, and she addressed the store's payroll issues by reducing employees' hours evenly across the board.  (Ex. B, Black Dep. at 16:24-25.)

Turner's comments regarding Loskot's age are precisely the type of evidence that shows unlawful discriminatory animus.  Turner cited Loskot's age as a reason that she was an undesirable employee and he made it clear that he did not want Loskot working in the Vision Center because of her age.  (Ex. B, Black Dep. at 87:13-88:23, 160:9-18; Ex. F, Black Affidavit [Dep. Ex. 65].)  The Eighth Circuit recently reversed summary judgment in a case where managers made similar comments displaying age animus.  In *Baker v. Silver Oak Senior Living*

---

[1] Wal-Mart suggests that Black made up Turner's age-comments after her termination because she was angry she was fired.  But both Loskot and Cindy Uhlinger state that Black told them about Turner's comments months before Black's termination.  (*See* Ex. A, Y. Loskot Dep. at 173:22-175:7; Ex. G., Uhlinger Interview.)  Wal-Mart also claims that Turner never told Black explicitly to "fire" Loskot.  But Turner's comments made it clear to Black that he wanted Loskot out of the Vision Center.  (Ex. B, Black Dep. at 160:9-18.)

3

*Mgmt. Co.*, 2009 WL 2914159, at *4, the court noted that managers' comments about the need to hire "younger people" was sufficient evidence from which a reasonable jury could find a discriminatory attitude, even though the employment action at issue was a termination, not hiring.  The court also noted that to the extent the managers' comments were ambiguous or open to interpretation, for purposes of summary judgment they must be interpreted in the light most favorable to the plaintiff.  *Id.*

Wal-Mart argues that Turner's comments were ambiguous and therefore cannot be probative of discriminatory intent.  "But the task of disambiguating ambiguous utterances is for trial, not for summary judgment.  On a motion for summary judgment the ambiguities in a witness's testimony must be resolved against the moving party."  *Shager v. Upjohn Co.*, 913 F.2d 398, 402 (7th Cir. 1990).

### B. When Turner Was Unable to Get Rid Of Yvonne Loskot Through Pam Black, He Used Jeff Bonora to Get The Job Done.

After Turner's comments in May 2005 showing his age bias and desire to remove Yvonne Loskot from the Vision Center, Pam Black and Loskot continued working together.  Three months later, in August, Black was investigated by Jeff Bonora, Wal-Mart's District Loss Prevention Supervisor, and terminated.  The next month, at Turner's urging, Loskot was investigated by Bonora.  The following month, in October 2005, Loskot was interrogated by Bonora and fired.  Turner's actions and his collaboration with the district's loss prevention supervisor strongly support the reasonable inference that Turner's bias was the "but-for" cause of Loskot's termination.

#### 1. Termination of Pam Black

In August 2005, just three months after Turner told Pam Black to get rid of Yvonne Loskot and Black refused, Black herself became the subject of an internal investigation at Wal-

4

Mart. Jeff Bonora called Black into a closed-door meeting and told her that she had failed to "protect company assests" during her management of a barbeque fundraiser. (Ex. B, Black Dep. at 94:4-7, 95:9-12.) Bonora interrogated Black about the fundraiser in a loud, confrontational manner, and accused her of stealing from the company during the fundraiser. (Ex. B, Black Dep. at 96:1-6.) Black was shocked by Bonora's accusations, as she had operated this fundraiser for years and handled everything the same way every year. (Ex. B, Black Dep. at 96:1-6.) In fact, Black had even received national recognition for this fundraiser in the past. (Ex. B, Black Dep. 93:17-94:9.) Bonora then told Black that if she signed a statement regarding the fundraiser that it would be no big deal and that he would talk to the head office and that she would keep her job. (Ex. B, Black Dep. at 107:8-13.) Black signed the statement (though she recalls it being a different statement than the one Wal-Mart has produced in this litigation), and almost immediately a police officer walked into the room, placed Black under arrest, handcuffed her and walked her out of the store in handcuffs. (Ex. B, Black Dep. at 102:21-103:23; 104:18-22; 107:14-20.) Black was terminated. (Ex. B, Black Dep. 138:11-13.)

### 2. Investigation of Yvonne Loskot

Shortly after Pam Black was fired, District Manager John Turner asked Jeff Bonora to begin investigating Yvonne Loskot. (Ex. S, Investigator On-Site Notes at 669.) Turner, as a District Manager and as Pam Black's former boss, knew Bonora and knew that Bonora had the ability to investigate employees and recommend their termination. Turner told Bonora that he wanted Bonora to investigate certain transactions in the DeSoto Vision Center, and he specifically told Bonora to look at Yvonne Loskot. (Ex. S, Investigator On-Site Notes at 669 ("John [Turner] specifically mentioned cp [Loskot] to Jeffrey [Bonora]….").)

5

While Wal-Mart contends that Turner just asked Bonora to look at some layaway reports (which the company has since destroyed[2]) and then had no further participation in the investigation, other evidence suggests that Turner was more closely involved in steering Bonora's investigation.  Vision Center employee Danielle Hyslop recalls seeing Turner and Bonora in the vision center together almost daily for two weeks after Pam Black's termination, and Turner admits that he gave Bonora BOSS reports during the investigation.  (Ex. I, Hyslop Dep. at 43:2-45:12; Ex. O, Turner Dep. at 106:25-107:3.)  Bonora informed Turner about the progress of his investigation, and included Turner, along with Store Manager Gary McClain, in the decision to terminate Loskot.  (Ex. J, Bonora Affidavit; Ex. M, Wal-Mart's Responses to EEOC First Interrogatories #2.)

### 3. Interrogation of Yvonne Loskot

On October 3, 2005, Bonora called Loskot into a closed-door meeting with Gary McClain and Manager Leisha Layton.  When Loskot entered the room, Bonora asked if she needed a drink of water or if she needed to go to the bathroom before they got started.  (Ex. Q, Loskot Affidavit.)  Loskot said "no", and then Bonora immediately began saying he wanted to "know if there's something going on in there [in the Vision Center] that you can tell me.  Tell me something."  (Ex. A, Y. Loskot Dep. at 109:11-15.)  Loskot asked Bonora what he wanted her to tell him, and he just said, "I just want to know what's going on in the vision department," refusing to tell her what his concerns were.  (Ex. A, Y. Loskot Dep. at 109:16-18.)  Bonora had a folder with some papers in it, and he opened and closed the folder and flapped it around, but he never showed Loskot any of the papers he had.  (Ex. A, Y. Loskot Dep. at 109:21-24, 122:24-

---

[2]  Wal-Mart admits that it destroyed all of the layaway reports which it claims were the initial basis of Turner and Bonora's investigation.  (Ex. L, Wal-Mart's Responses to EEOC's Requests for Admissions #7.)  Because these documents were in Wal-Mart's control and the company destroyed them, the jury may infer that these documents would have been unfavorable to Wal-Mart.  *See McCrary-El v. Shaw*, 992 F.2d 809, 812-13 (8th Cir. 1993) (holding that the trial court erred when it did not properly instruct the jury on adverse inference doctrine).

123:3.) Bonora asked Loskot if her grandchildren had used Project Insight services for her grandchildren, which she readily admitted, stating that John Turner had given permission for her grandchildren and other employees' children to use the services.  (Ex. A, Y. Loskot Dep. at 109:23-110:7; Ex. K, Bonora Stmt.)  Bonora told Loskot, "I'll take you to court if you don't tell me something," and Loskot replied she didn't know what he wanted her to tell him.  (Ex. A, Y. Loskot Dep. at 110:8-12.)  Bonora asked Loskot a few questions about an order for another Wal-Mart employee, Carol Crocker, but he did not ask her about any other orders for herself or other family members, aside from the Project Insight orders.(Ex. A, Loskot Dep. 146:15-23.)  Loskot eventually told Bonora that she had kept her receipts for her orders and purchases, and that's when he finally said he would let her go and that she should bring the receipts back to the store the next day.  (Ex. A, Loskot Dep.110:18-111:2).

Wal-Mart seeks to portray Bonora's interrogation of Yvonne Loskot as a conversation and an opportunity for Loskot to answer simple questions about her purchases, and claims that Loskot refused to cooperate.  But Loskot's version of events is quite different, and it is her version which must be considered on summary judgment.  Loskot describes an interrogation – a proceeding where Bonora treated her as a suspect and adversary (even threatening to take her to court), rather than as an employee with whom he wanted to engage and legitimately find answers to his questions.  And Loskot's description is consistent with Pam Black's testimony regarding Bonora's aggressive behavior during her own interrogation, as well as Bonora's many "meetings" she witnessed in her role as a manager.  (Ex. B, Black Dep. at 96:16-22, 97:10-98:2.)

    **4.**  **Termination of Yvonne Loskot**

After her interrogation by Bonora, Yvonne Loskot was very upset and flustered.  (Ex. A, Y. Loskot Dep. at 150:9-12; Ex. SS, E. Loskot Dep. at 35:15-21.)  She went home and looked for

7

any receipts or paperwork she could find related to her and her family's Vision Center orders. (Ex. A, Y. Loskot Dep. at 147:8-18.)  Bonora had not asked Loskot about any of Loskot's personal orders, but she was flustered by Bonora's threats to take her to court and she wanted to take him all the receipts she could find.  (Ex. A, Y. Loskot Dep. at 147:15-148:18.)  The next day, October 4, Loskot called her doctor's office and made an appointment for that day to be treated for the stress, anxiety and depression she was experiencing from her interrogation.  (Ex. A, Y. Loskot Dep. at 149:10-151:1; Ex. SS, E. Loskot Dep. at 35:23-36:3.)  Loskot told her doctor about her experience at work the previous day, and the doctor diagnosed her with anxiety and hypertension and prescribed a strong medication that caused her to sleep.  (Ex. A, Y. Loskot Dep. at 151:2-21.)  The doctor also told her that she was under so much stress that she needed to take a leave of absence from work, and he signed a note and a leave of absence request form for her stating that she should not return to work for 30 days due to her anxiety and hypertension. (Ex. T, Doctor's Note; Ex. U, Leave of Absence Request; Ex. SS, E. Loskot Dep. at 35:23-36:3.)

Later that day, Loskot and her husband went to the Wal-Mart store to turn in the receipts she had found and for Loskot to submit a request for a sick leave.  (Ex. A, Y. Loskot Dep. at 152:9-15; Ex. SS, E. Loskot Dep. at 36:17-37:14.)  Following Wal-Mart's procedure for requesting sick leave, Loskot took her leave request to her supervisor, Pam Cape, who approved it, and then she took the approved request and an envelope containing all of the receipts she had found and left them in the main office for Store Manager Gary McClain.  (Ex. V, Leave of Absence Policy at A00693-693 [Dep. Ex. 54]; Ex. U, Leave of Absence Request; Ex. A, Y. Loskot Dep. at 152:9-153:22; Ex. SS, E. Loskot Dep. at 36:17-37:14.)

The following day, October 5, Loskot was still suffering from anxiety and the side effects of the drugs prescribed by her physician.  (Ex. A, Y. Loskot Dep. at 151:16-21.)  She did not go

8

to work because she was sick, heavily medicated, and her leave of absence request had been approved by her supervisor. (Ex. A, Y. Loskot Dep. at 170:19-171:4.) She did receive a call from Jeff Bonora that day, and he left a message on her answering machine, stating, "Yvonne, since you have chosen not to come in for our meeting, you will have to suffer the consequences." (Ex. SS, E. Loskot Dep. at 61:18-24; Ex. A, Y. Loskot Dep. at 171:5-17.) Loskot was still sick and unable to talk to anyone, but her husband faxed a letter to Bonora and Gary McClain asking that any further communications from the store be in writing. (Ex. W, E. Loskot Fax to J. Bonora.) The next communication Loskot received from Wal-Mart was a letter from Bonora and McClain stating that her employment was terminated effective October 5, 2005. (Ex. VV, Termination Letter; Ex. A, Y. Loskot Dep. at 184:12-14.)

### 5. Turner's Involvement - Proof of Unlawful Age Discrimination

Wal-Mart argues that Turner's age animus is irrelevant because Bonora investigated Loskot and Store Manager McClain made the ultimate decision to fire her. But Wal-Mart's position is not supported by the facts or the law. First, Wal-Mart admits that Turner was involved in the decision to terminate Yvonne Loskot ( Ex. M, Wal-Mart's Responses to EEOC's First Interrogatories #2.), Danielle Hyslop observed Turner and Bonora working together almost daily for two weeks between Black's termination and Loskot's termination (Ex. I, Hyslop Dep. at 43:2-45:12.), Turner admits that he gave Bonora BOSS reports during the investigation ( Ex. O, Turner Dep. at 106:25-107:3.), and Bonora admits that he discussed the investigation's findings with Turner before interrogating Loskot. (Ex. J, Bonora Affidavit.)

Second, the law does not require that Turner, as the person with the discriminatory animus, make the final termination decision himself. In *Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1060 (8th Cir. 1993), the court found that there was sufficient evidence of sex

9

discrimination when the manager who had displayed sex animus prompted a security investigation of the plaintiff, even though the manager himself did not conduct the investigation or make the disciplinary decisions. The court found that the security officer had been the manager's "cat's paw", a "conduit of his prejudice." *Id.* Other courts have also recognized and applied this "cat's paw" theory. *See Dedmon v. Staley*, 315 F.3d 948, 949 (8th Cir. 2003)("an employer cannot shield itself from liability for unlawful termination by using a purportedly independent person . . . as the decision maker where the decision maker merely serves as the conduit, vehicle, or rubber stamp by which another achieves his or her unlawful design"); *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484-85 (10th Cir. 2006) (discussing the "cat's paw" theory); *Shager*, 913 F.2d at 405. The Eighth Circuit has also held that "'[c]omments which demonstrate a discriminatory animus . . . uttered by individuals *closely involved in employment decisions*'" can be sufficient proof of unlawful employment discrimination. *Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1323 (8th Cir. 1994) (citations omitted) (emphasis added).

      **C.**     **After Loskot Was Fired, Turner Had a Much Younger Staff at the DeSoto Vision Center.**

The replacement of an older employee with younger employees can be circumstantial evidence of age discrimination. *Keathley v. Ameritech Corp.*, 187 F.3d 915, 919-20 (8th Cir. 1999). In this case, Loskot's termination and the replacements subsequently brought in to the Vision Center drastically reduced the average age of the employees in the department. After Loskot's termination, the only employee remaining in the Vision Center who was over 40 years old was Cynthia Uhlinger, who, at age 48, was nineteen years younger than Yvonne Loskot. (Ex. R, Wal-Mart's Responses to EEOC's Third Interrogatories.) The other three remaining employees were even younger: Danielle Hyslop, age 23, Pamela Cape, age 26, and Melanie

10

McKalip, age 18. (Ex. R, Wal-Mart's Responses to EEOC's Third Interrogatories.) During the next several months, Wal-Mart placed five more employees in the Vision Center, all of whom were 40 or younger. Julie Billingsley, age 23, began working in the Vision Center in December 2005; Timothy Stevens, age 21, began working in the Vision Center in March 2006; Angela Christopher, age 40, began working in the Vision Center in July 2006; Anita Rumpsa, age 38, began working in the Vision Center in August 2006; and Sabrina Dierks, age 19, began working in the Vision Center in September 2006. (Ex. R, Wal-Mart's Responses to EEOC's Third Interrogatories.) And while Turner told Pam Black that Yvonne Loskot was too old and suggested that she made too much money by stating that she could be replaced with two younger employees, it is clear that Loskot's, age, not her pay, was the definitive factor in selecting replacement employees, as demonstrated by the employment of 40-year old Angela Christopher in the Vision Center just months after Loskot's termination at a rate of $17.18 per hour.[3]

## II.    WAL-MART'S CHANGING REASONS FOR LOSKOT'S TERMINATION ARE PRETEXT FOR AGE DISCRIMINATION.

While the Court in *Gross* questioned whether the *McDonnell Douglas* burden-shifting formula should still apply in ADEA cases, it declined to decide the issue, leaving in place the fact-finder's ability to decide whether an employer's proffered reasons for its actions are pretextual. *See Gross*, 129 S.Ct at 2349 n.2; *Baker*, 2009 WL 2914159, at *4 (considering whether the employer's shifting reasons for terminating the plaintiff were pretext for age discrimination). *See also*, *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 122 (1985) (recognizing that a claim of age discrimination may be proven using the *McDonnell Douglas* burden-shifting formula). "Not every supplement to an employer's initial statement of reasons gives rise to an inference of pretext, but substantial variations raise suspicion." *Baker*, 2009 WL

---

[3] Loskot's final pay rate was $17.95 per hour. (Ex. R, Wal-Mart's Responses to EEOC's Third Interrogatories.)

11

2914159, at *5, citing *EEOC v. Trans States Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006). *See also Young v. Warner-Jenkinson Co., Inc.*, 152 F.3d 1018, 1023 (8th Cir. 1998) (holding that when a plaintiff shows that an employer has offered conflicting explanations for its actions, this evidence "not only supports an inference that [the employer] has abandoned its initial stance, but also supports a reasonable inference that the company's current explanation is contrived").

In this case, Wal-Mart's reasons for its investigation of Loskot, as well as for her termination, have varied substantially and certainly raise suspicion. During his interrogation of Loskot, Bonora's focus was Project Insight. Bonora's notes regarding Loskot's termination state that she was terminated for "Gross Misconduct theft", an obvious reference to Project Insight.[4] particularly when combined with the restitution documents Bonora prepared showing an amount owed equal to the value of the three Project Insight services received by Loskot's grandchildren. (Ex. K, Bonora Stmt.; Ex. C, Bonora Dep. at 325:5-326:1, 332:14-333:8 (showing amount owed of $198); Ex. X, Order #1000237 BOSS Reports (showing services valued at $38); Ex. Y, Order #1000202 BOSS Reports (showing services valued at $38); Ex. X, Order #1000237 BOSS Reports (showing services valued at $122).) During Loskot's unemployment hearings, Wal-Mart's repeated explanation for her termination was Project Insight. ( Ex. N, Div. of Emp. Security File at 37 and 51.) Then suddenly, halfway through the EEOC's investigation of Loskot's Charge of Discrimination, Wal-Mart abandoned Project Insight as the reason for Loskot's termination and suddenly began raising other transactions as the reason for Loskot's discharge. *Compare* Ex. QQ, Wal-Mart's 8/9/06 EEOC Position Statement (referring only to

---

[4] On October 12, 2005, Bonora also prepared documents to seek restitution from Loskot, and he noted that the "total restitution owed" was $198. (Ex. C, Bonora Dep. at 325:5-326:1, 332:14-333:8, 331:8-15; Ex. PP, ROAR Documentation [Dep. Ex. 52] at A00710.) The value of the Project Insight services received by Loskot's grandchildren was also $198. (Ex. K, Bonora Stmt.; Ex. X, Order #1000237 BOSS Reports (showing services valued at $38); Ex. Y, Order #1000202 BOSS Reports (showing services valued at $38); Ex. X, Order #1000237 BOSS Reports (showing services valued at $122).) The fact that Bonora did not intend to seek restitution for any other orders allegedly "stolen" by Loskot supports the EEOC's argument that these orders did not become an issue for Wal-Mart until the EEOC's investigation.

12

Project Insight as the reason for Loskot's termination), *with* Ex. RR, Wal-Mart's 9/5/07 Response to Request for Information (attaching a long list of "problem" transactions) *and* Ex. S, Investigator 11/29/07 On-Site Notes at 672 (Bonora states that Project Insight "was not even a 10th of the problem").)

### III. BONORA'S SUPERFICIAL INVESTIGATION SUPPORTS THE INFERENCE THAT AGE WAS THE BUT-FOR REASON FOR LOSKOT'S TERMINATION

Wal-Mart has identified twenty "questionable" orders which it claims gave Bonora a legitimate basis for recommending Yvonne Loskot's termination. But anything more than a cursory look at these transactions and the receipts Loskot gave to Bonora and McClain shows that *eighteen* of these transactions are easily explained or, as admitted by Bonora, were beyond the scope of his investigation. If Bonora had really considered all of the evidence available to him, including the receipts and documentation produced by Loskot, he would have concluded that Yvonne Loskot was not engaged in any type of misconduct. But Bonora did not draw that conclusion, and the jury may certainly infer from his failure to consider all the evidence that his investigation of Loskot was really just a way of legitimizing her illegal termination – a termination influenced and tainted by Turner's age bias.

Wal-Mart's own documents, as well as those produced by Loskot, show these simple explanations for the transactions Wal-Mart claims were at issue:

- Order # 1000237 for A.B. (Loskot's granddaughter) dated 11/11/04 was clearly marked "Project Insight", and Loskot admitted to Bonora that three of her grandchildren had received Project Insight services with John Turner's permission. (Ex. X, Order #1000237 BOSS Reports; Ex. K, Bonora Stmt.)

- Order # 1000202 for Michelle Burg (Loskot's granddaughter) dated 11/8/04 was also clearly marked "Project Insight". (Ex. Y, Order #1000202 BOSS Reports.)

- Order # 1000238 for Anthony Burg (Loskot's grandson) dated 11/11/04 was also clearly marked "Project Insight".  (Ex. X, Order #1000237 BOSS Reports & Supporting Documents.)  Although Bonora claimed that Anthony Burg was Loskot's brother (based on an incorrect birthdate of 1954 in the BOSS system), only a little bit of investigative work would have revealed that a patient named Tony Burg had the same home phone number as Anthony, resided in Blackwell, MO (as did Anthony), and had a birthdate of 1958, suggesting, at the very least, that Anthony's identity was unclear and that perhaps further investigation was warranted.  (*Id.*)  Moreover, it is unclear when or how Anthony Burg's birthdate was changed in the BOSS system, because a Vision Center order from 10/16/2003 shows that Anthony Burg is a minor.  (*Id.* at EEOC 00787.)

- Order #s 1115225, 1119801 and 1119805 for Heather Burg (another granddaughter) from 1996 and 1997 were almost a decade old by the time Bonora reviewed them, and even Bonora admitted that they were not of concern to him.  (Ex. Z, Order #s 1115225, 1119801 and 1119805 BOSS Reports; Ex. C, Bonora Dep. at 247:25-248:12.)

- Order # 1001189 for Tony Burg (Loskot's son) dated 2/17/05 was for a pair of gray polarized lenses at $27.50 each and a $94 Stetson frame (prescription sunglasses).  (Ex. AA, Order # 1001189 BOSS Report & Supporting Documents.)  Bonora questioned the employee discount applied to this transaction, but Loskot's receipt and credit card statement show that she, not her son, paid for the services.  (*Id.*)  Bonora admits that Loskot was entitled to use her employee discount for any products or services she purchased at Wal-Mart, even if they were gifts for her

14

relatives. (Ex. C, Bonora Dep. at 275:8-19.) This order was based on a prescription written just two weeks earlier, on 1/29/05, and Loskot produced a receipt for that exam, a frame, and pair of lenses purchased on 2/18/09. (Ex. AA, Order # 1001189 BOSS Report & Supporting Documents at EEOC 00846B.) Bonora also noted that there was a refund associated with this order, which is explained in association with Order # 1002056 below.

- Order # 1001538 for Tony Burg dated 3/19/05 is a remake of the 1/29/05 order for a frame and lenses. The BOSS system notes that it is a rush job, and it is for a pair of clear Flat Top 35 Clear (regular bifocal lenses) at $22.50 each and the same $94 Stetson frame purchased on 1/29/05. As a remake of a pair of glasses that was already paid for on 1/29/05, no additional receipt would be expected. (Ex. BB, Order # 1001538 BOSS Report.)

- Order # 1002056 for Tony Burg dated 5/7/05 was for a remake of the lenses from Order # 1001189, replacing the $27.50 lenses with $40 bifocal polarized lenses. The BOSS system shows that the order was ready on 5/13/05, and Loskot's receipt shows that she paid for the more expensive lenses on 5/14/05. The frame remained the same, and would not have been refunded or paid for again. (Ex. CC, Order # 1002056 BOSS Report & Supporting Documents.)

- Order # 1173656 for Yvonne Loskot dated 3/16/02 shows in the BOSS system that there was a sale of $86.38 and two payments of $43.19 each on 3/16/02 and 4/17/02, for a complete payment of $86.38. (Ex. DD, Order # 1173656 BOSS Report & Supporting Documents.) Loskot's own credit card statements suggest that these payments were made, showing a $43.19 charge at the Festus Wal-Mart

15

on 3/16/02 and multiple additional charges at the Festus Wal-Mart on 4/21/02 which, if combined with other purchases, could have included the $43.19 payment. (Ex. DD, Order # 1173656 BOSS Report & Supporting Document.) Certainly, with the BOSS system itself showing both of these payments, there is no reason to assume that Loskot stole these glasses, as opposed to it simply being Bonora's misreading of the records.

- Order # 1190213 for Yvonne Loskot dated 8/6/03 shows in BOSS system that this order for $54.84 was fully paid for. (Ex. EE, Order # 1190213 BOSS Report.)

- Order #1191544 for Yvonne Loskot dated 9/13/03 was a remake of Order # 1190213, but for a more expensive pair of glasses. Loskot's receipt shows that she paid the difference in price, $34.14, on 9/13/03, and she even made a handwritten note on the receipt that this order was in tray # 1080. (Ex. FF, Order # 1191544 BOSS Report & Supporting Documents.)

- Order # 1192798 for Yvonne Loskot dated 10/25/03 shows in the BOSS system that the order was cancelled, so no payment would be expected. (Ex. GG, Order # 1192798 BOSS Report.)

- Order # 1005154 for Yvonne Loskot dated 8/21/04 shows in the BOSS system that the order was cancelled, so no payment would be expected. (Ex. HH, Order # 1005154 BOSS Report.)

- Order # 1005155 for Yvonne Loskot dated 8/21/04 shows in the BOSS system that the order was cancelled, so no payment would be expected. (Ex. II, Order # 1005155 BOSS Report.)

16

- Order # 1005156 for Yvonne Loskot dated 8/21/04 shows in the BOSS system that this order was paid for on 8/23/04, and Loskot's receipts confirm her payment.  (Ex. JJ, Order # 1005156 BOSS Report & Supporting Documents.)

- Order # 1001049 for Yvonne Loskot dated 2/5/05 shows in the BOSS system that Pam Black noted that this order was a remake from an order originally taken in Desloge, apparently Order # 1005156 from less than six months before, and it was a remake of the lenses only (no frame was ordered).  (Ex. KK, Order # 1001049 BOSS Report.)  Although the replacement lenses (at $22.50 each) were slightly more expensive than the original lenses (at $20.50 each), it would not be unusual or unexpected for there to be no charge for the replacements if there had been a problem with the original lenses.

The only two transactions for which there is no easily determined explanation are Order # 1193112 for Yvonne Loskot dated 11/5/03 and Order #1001965 for Yvonne Loskot dated 11/19/03.  Both of these orders were created two years before Loskot's termination, and she admits at this point that she cannot recall the circumstances regarding these orders.  (Ex. Q, Loskot Affidavit.)  Nonetheless, it would seem almost ridiculous for Wal-Mart to terminate Loskot simply because she could not find receipts from purchases two years before, and Bonora never highlighted either of these orders as being the "real reason" for Loskot's termination.

"[E]vidence that a defendant's explanation for an employment practice is 'unworthy of credence' is 'one form of circumstantial evidence that is probative of intentional discrimination'." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citation omitted).  *See also Lynn v. Deaconess Med. Ctr.*, 160 F.3d 484, 489 (8th Cir. 1998) (holding that plaintiff's evidence that employer's proffered reasons for employment action were "flimsy" and

17

"susceptible of disbelief" supported reversal of district court's summary judgment ruling); *Fisher v. Upjohn*, 225 F.3d 915, 921-22 (holding that sufficient evidence to create question of fact of pretext where employee showed that employer's proffered reasons were false). In this case, each of Wal-Mart's shifting reasons are unworthy of credence. Loskot had permission for her grandchildren to receive Project Insight services. Loskot was not guilty of theft. Loskot did not refuse to cooperate with Bonora's investigation. "If the only reason an employer offers for firing an employee is a lie, the inference that the real reason was a forbidden one, such as age, may be rationally drawn." *Shager*, 913 F.2d at 401. Even if the inference of unlawful discrimination is not the only possible conclusion, "if the inference of improper motive *can* be drawn, there must be a trial." *Id.* (emphasis in original). When one looks at the facts in this case, the reasonable, rational inference is that age was the "but-for" reason that Loskot was terminated.

## **CONCLUSION**

Wal-Mart's termination of Yvonne Loskot was motivated by John Turner's belief that she was "too old" and could be replaced with "two younger people". Wal-Mart's denials of Turner's bias and involvement in her termination are contrary to credible witness testimony and the weight of the evidence. The reasons Wal-Mart has offered to justify its actions are shifting and, again, contrary to the evidence. For these reasons, Wal-Mart's motion for summary judgment must be denied.

> BARBARA A. SEELY  ARN 10607
> Regional Attorney
> EQUAL EMPLOYMENT OPPORTUNITY
> COMMISSION
> St. Louis District Office
> 1222 Spruce St., Rm. 8.100
> St. Louis, MO 63103
> (314) 539-7910 (telephone)

18

        (314-539-7895 (facsimile)
        barbara.seely@eeoc.gov

/s/ Andrea G. Baran
ANDREA G. BARAN  MO #46520
Senior Trial Attorney
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
400 State Avenue, Suite 905
Kansas City, Kansas 66101
(913) 551-5848 (telephone)
(913) 551-6957 (facsimile)
e-mail: barbara.seely @eeoc.gov
       andrea.baran@eeoc.gov

ATTORNEYS FOR PLAINTIFF
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION

## CERTIFICATE OF SERVICE

A copy of the foregoing was served via the Court's CM/ECF system on October 21, 2009, to:

    James F. Bennett
    jbennett@dowdbennett.com

    Erika M. Anderson
    eanderson@dowdbennett.com

    Jennifer L. Aspinall
    jaspinall@dowdbennett.com

/s/ Andrea G. Baran
Attorney for Plaintiff