**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY | ) | |
| COMMISSION, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIV. ACTION NO.** |
| **v.** | ) | **08-cv-01439-AGF** |
| | ) | |
| WAL-MART STORES, INC., | ) | |
| | ) | |
| **Defendant.** | ) | |

**RESPONSE TO DEFENDANT'S STATEMENT OF FACTS**

1.      Loskot began working for Wal-Mart on September 30, 1995 as an optician.

   **Undisputed.**

2.      During her entire employment with Wal-Mart, Loskot worked as an optician.

   **Undisputed.**

3.      Loskot initially worked at the Wal-Mart store in Festus, Missouri.

   **Undisputed.**

4.      Loskot later transferred to the Wal-Mart store in Desloge, Missouri, where she worked

   with Gary McClain, and then to the DeSoto, Missouri Wal-Mart store.

   **Undisputed.**

5.      McClain was the store manager at the DeSoto store in 2005.

   **Undisputed.**

6.      Loskot received a decision-making day in 2001, which is a form of disciplinary action at

   Wal-Mart, after she made certain comments to Wal-Mart associates in the Tire and Lube

   Department.

**Undisputed.  Loskot had complained to the Tire and Lube department manager because associates in that department had repeatedly left her new car filthy with grease after service.  Ex. A., Y. Loskot Dep. at 32:11-34:14.**

7.    A decision-making day is the final opportunity for an associate to evaluate her conduct and decide whether she will make the necessary improvement.

**Undisputed.**

8.    Loskot's husband sent a letter to the president of Wal-Mart at its corporate headquarters in Bentonville, Arkansas to complain that the Tire and Lube Department left grease in Loskot's car.

**Undisputed.**

9.    Loskot and her husband sent the letter to let Wal-Mart know that things were not being handled properly or to her satisfaction.

**Undisputed.**

10.    The Vision Center used layaway because glasses were custom made. The layaway reports listed the patient's name, the order number, the date the item was placed on layaway, the deposit amount, the remaining balance, and the date they needed to pick up the glasses.

**Undisputed.**

11.    When placing merchandise on layaway, a customer was required to pay at least 50% of the price as a down payment.

**Disputed.  While a 50% down payment was typical, there were times when it was not required.  Ex. B, Black Dep. at 50:8-19; Ex. A., Y. Loskot Dep. at 54:24-56:9.**

12.    Items were only to remain on layaway for ninety days; extending that time period required the district manager's permission.

**Disputed.  Ninety days on layaway was preferred, but not required.  Ex. B, Black Dep. at 55:12-22.**

13.   When an item was placed on layaway, it was considered a sale.

**Undisputed.**

14.   A layaway order should always correspond to merchandise in a layaway bin.

**Disputed in part.  While this is how the system *should* work, there were times when layaway orders did not have any corresponding merchandise.  Ex. B, Black Dep. at 157:8-158:21; Ex. A., Y. Loskot Dep. at 59:24-60-8.**

15.   Merchandise on layaway should not be dispensed prior to collecting the entire outstanding balance.

**Undisputed.**

16.   When a patient came to pick up the glasses, the layaway order was pulled to register and it would no longer appear on the layaway report.

**Disputed.  Typically, layaway orders that had been picked up no longer appeared on the layaway report, but computer problems, remakes, human error or other factors could cause items to remain on the layaway report even after they had been fully paid for and picked up by the customer.  Ex. B, Black Dep. at 157:8-158:21; Ex. A., Y. Loskot Dep. at 59:24-60-8.**

17.   Layaway reports that reflect items that are past due are still considered sales.  Keeping them on the layaway report postpones having to report a loss on the Vision Center financials.

**Undisputed.**

18.     If a layaway order was canceled, a notation was made in Wal-Mart's internal system,

        called the BOSS system.

        **Disputed in part.  While this was usually done, there might be times when it was not.**

        **Ex. Q, Loskot Affidavit.**

19.     Associates were not supposed to take orders or ring up sales for themselves or their

        family members.

        **Undisputed.**

20.     Orders in the Vision Center were entered into an internal system called the "BOSS"

        system.

        **Undisputed.**

21.     Information entered into the BOSS system included the patient's name, address and

        personal information such as date of birth, the name of the doctor, the prescription, the

        items orders and the prices for those items. It also included the dates of the exam, the

        name of the Wal-Mart associate who entered the information, and an order number.

        **Undisputed.**

22.     An order in the BOSS system must be manually entered in the register, or "pulled to

        register," before a receipt evidencing payment is created.

        **Disputed in part.  While this is what typically happens, it is not impossible for**

        **someone to pay for a vision center order and receive a receipt even though the**

        **BOSS system says that the order was not "pulled to register".**

23.     When an item is pulled to register, the BOSS system shows the date that it was pulled to

        register; if the item was not pulled to register, the system notes that it was not pulled to

        register.

**Disputed in part.  While this is what typically happens, sometimes payments are made and register receipts created, but the BOSS system still says that the order was not "pulled to register".**

24.    An order that is pulled to register shows up on the electronic journal, which tracks everything that goes through a cash register and everything that is on each receipt.

**Undisputed.**

25.    Wal-Mart's warranty on glasses did not cover normal wear and tear.

**Disputed.  The practice at the stores where Loskot worked was to allow remakes even for damage accidentally caused by the customer.  Ex. A., Y. Loskot Dep. at 64:25-66:25.**

26.    Vision Center employees had to obtain a manager's permission to remake a customer's glasses after the warranty had expired.

**Undisputed.**

27.    Remakes of glasses were generally allowed three to six months after the original purchase.

**Disputed in part.  In some circumstances, remakes were allowed after that period of time.  The priority was to service the customer.  Ex. B, Black Dep. at 64:7-65:14.**

28.    During a remake, if the replacement glasses were more expensive than the original, the customer was required to pay the difference.

**Disputed.  Sometimes there were reasons why a customer would not be required to pay the difference even if the remake was more expensive than the original item.  Ex. B, Black Dep. at 61:13-63:17.**

29.    Remakes must also be pulled to register to account for the exchange of the product and/or money.

**Disputed. The testimony cited by Defendant states that "[t]here may be situations where you can't" pull a remake to the register. Ex. C, Bonora Dep. at 233:24-234:2.**

30.    A manager had to approve any situation where the customer was not charged for the difference between the original price and the remake, and a note granting such permission was placed in the file.

**Disputed. The fact as written misstates the witness' testimony. Black testified that the *reason for the remake* should be noted in the computer, not that the manager would note that permission had been granted. Ex. B, Black Dep. at 62:13-25.**

31.    Defective lenses could generally be replaced 60 to 90 days after the original purchase. If the defect was a customer's fault, Wal-Mart would not replace them.

**Disputed. The practice at the stores where Loskot worked was to allow remakes even for damage accidentally caused by the customer, subject to the manager's approval. Ex. A., Y. Loskot Dep. at 64:25-66:25.**

32.    Project Insight was a charitable program started by Wal-Mart to provide 20 exams and/or eyeglasses to underprivileged children in the community free of charge.

**Undisputed.**

33.    The goal was to provide 20 free exams; however, there was no penalty or reprimand for not achieving this amount.

**Disputed. Ex. WW, Turner Performance Evaluation; Ex. B, Black Dep. at 71:2-10.**

34.    If a store filled all of its 20 slots set aside for Project Insight, it could refer patients to a different store that had slots available.

**Undisputed.  Vision Center managers talked to each other about slots they had available and even made slots available to needy adults.  Ex. B, Black Dep. at 71:25-72:23; Ex. A., Y. Loskot Dep. at 80:4-83:25.**

35.     Managers were not evaluated on their ability to fill Project Insight.

**Disputed.  Ex. WW, Turner Performance Evaluation; Ex. B, Black Dep. at 71:2-10.**

36.     The Vision Center manager, not the district manager, reviewed the Project Insight reports stating who had participated in the program that year.

**Disputed in part.  The District Manager was aware of each store's progress in completing its Project Insight goals, and the District Manager knew the identities of some participants because he was told by the Vision Center Manager.  Ex. B, Black Dep. at 72:11-17, 74:1-10, 75:23-76:16.**

37.     Pursuant to the program's guidelines, each Vision Center was to "adopt" an elementary or pre-school, childcare center, orphanage, shelter, church or Department of Human Services.

**Undisputed that this is what the program's guidelines said.  In the DeSoto store, particularly in the first year it was open, the Vision Center had difficulty filling its Project Insight slots because the schools did not refer enough needy children.  Ex. B, Black Dep. at 72:24-73:24.**

38.     The Vision Center was to select its "adoptee facility" and explain the program to a representative at that facility.

**Undisputed that this is what the program's guidelines said.**

39.     A Vision Center could "adopt" more than one facility.

**Undisputed that this is what the program's guidelines said.**

40.     The representative would identify children in need of eye care and refer them to the

program.

**Undisputed that this is what the program's guidelines said.  In the DeSoto store,**

**particularly in the first year it was open, the Vision Center had difficulty filling its**

**Project Insight slots because the schools did not refer enough needy children.  Ex. B,**

**Black Dep. at 72:24-73:24.**

41.     The Vision Center would then coordinate with the doctor to schedule the exams.  Project

Insight orders were placed in the BOSS system but were not pulled to register.

**Undisputed.**

42.     Wal-Mart employees are not supposed to accept gifts or gratuities.

**Disputed.  This statement is misleading because the cited policy prohibits Wal-Mart**

**associates from accepting gifts from *suppliers*.  It does not prohibit needy Wal-Mart**

**associates or their children from receiving charitable services from Wal-Mart that**

**they or their families would otherwise be eligible to receive.  Ex. D, Wal-Mart**

**Associate Handbook at 519.**

43.     Children of Wal-Mart employees were not supposed to participate in the Project Insight

program.

**Disputed.  John Turner gave permission to Pam Black for at least two employees'**

**needy children to participate in Project Insight.  Ex. B, Black Dep. at 73:19-77:5,**

**78:6-18.  Black then told these employees that their children could participate.  Ex.**

**E, Pennock Interview.  Turner also gave permission for Yvonne Loskot's**

**grandchildren to receive Project Insight services.  Ex. B, Black Dep. at 76:10-19; Ex.**

**A., Y. Loskot Dep. at 91:4-23.**

44.     In 2005, John Turner was a district manager over the Vision Center in DeSoto, Missouri.

        **Undisputed.**

45.     In 2005, Pam Black was the Vision Center manager at the Wal-Mart store in DeSoto,

        Missouri.

        **Undisputed.**

46.     As district manager, Turner did not necessarily know specific employees' rate of pay.

        **Disputed in part.  Turner did know employees' rates of pay generally.  Ex. O,**

        **Turner Dep. at 10:10-11:13.**

47.     In his role as district manager, Turner reviewed the payroll of the stores under his

        supervision and compared it with the sales.

        **Undisputed.**

48.     If a store had good sales, the payroll percentage would be down regardless of what

        individual employees were paid. Someone with a lot of experience would have higher

        sales, which would address differences in the payroll.

        **Undisputed.**

49.     Cutting the hours of higher paid employees is like "shoot[ing] yourself in the foot"

        because higher paid employees have more experience and certifications and do better in

        sales. Cutting the hours of higher sales producers leaves lower sales producers which do

        not provide enough sales to cover payroll and creates a cycle.

        **Opinion improperly stated as fact.  Undisputed that in litigation John Turner stated**

        **that this was his opinion at the time.  It is disputed whether this was his opinion at**

        **the time that he told Pam Black to get rid of Yvonne Loskot.  *See* Ex. B, Black Dep.**

        **at 10:14-11:8.**

50.     Because the Vision Center manager set the sales goals for each Vision Center, Black set

        sales goals at the DeSoto store.

        **Disputed.  Black set these goals in consultation with Turner, and Turner himself**

        **was evaluated on whether his stores met their sales goals.  Ex. B, Black Dep. at 34:1-**

        **23; Ex. WW, Turner Performance Evaluation.**

51.     It was up to the Vision Center manager to get the payroll percentage where it needed to

        be. They had several options to accomplish this, including reducing associates' hours,

        asking for volunteers to cut back on hours or moving someone to a different division in

        the store.

        **Disputed.  District Manager John Turner was also involved in the process of**

        **controlling payroll.  Turner met with Black to review employee schedules to help**

        **control payroll.  Ex. B, Black Dep. at 34:1-23.**

52.     Increased sales also addressed payroll problems.

        **Undisputed.**

53.     According to Pam Black, John Turner told her that she needed to cut payroll hours in the

        Vision Center. This would not be unusual because Turner talked to her about controlling

        her payroll "all of the time."

        **Undisputed.**

54.     According to Black, Turner told her to cut everybody's hours.

        **Undisputed.**

55.     Black claims to have asked him whether she should also cut Loskot's hours because she

        had the most experience. Turner told her that she should cut everybody's hours.

**Undisputed.  Turner also made it clear to Black that he did not want Loskot working in the Vision Center.  Ex. B, Black Dep. at 160:1-18.**

56.   Black claims to have asked Turner what if Loskot quit after her hours were cut.  Turner allegedly told her to cut Loskot's hours, that Loskot was getting older and would likely quit anyway and that Black could hire two people to replace her.

   **Undisputed.**

57.   Black cut everyone's hours in the Vision Center.

   **Undisputed.**

58.   Black claims to have told Turner that Loskot was upset when her hours were cut.  Turner allegedly told Black that Loskot was getting older, would likely retire soon and that Black could hire two people to replace her.

   **Undisputed.**

59.   Black did not talk to anyone in management about Turner's statement because she believed "he was just expressing his opinion as to how to fix [her payroll] problem."

   **Undisputed.**

60.   Turner never told Black to terminate Loskot. Even Black admitted that he merely said that if she quits, she quits.

   **Disputed.  Turner made it clear to Black that he did not want Loskot working in the Vision Center.  Ex. B, Black Dep. at 160:1-18; Ex. F, Black Affidavit.  Black told Cindy Uhlinger that Turner had instructed her to get rid of Yvonne Loskot.  Ex. G, Uhlinger Interview.**

61.   Turner never said that Loskot should be terminated because of her age and/or because she made too much money.

**Disputed.  Turner told Black that Loskot was too old and that she made too much money, and he made it clear to Black that he did not want Loskot working in the Vision Center.  Ex. F, Black Affidavit; Ex. B, Black Dep. at 10:16-11:4, 13:13-18, 16:21-17:6, 160:1-18.  Black told Cindy Uhlinger that Turner had instructed her to get rid of Yvonne Loskot.  Ex. G, Uhlinger Interview.**

62.    Turner never said that he thought Loskot was too old or made too much money to work at Wal-Mart.

**Disputed.  Turner told Black that she should get rid of Loskot because she was getting too old and Black could hire two younger people to replace her.  Ex. F, Black Affidavit; Ex. B, Black Dep. at 10:16-11:4, 13:13-18, 16:21-17:6, 160:1-18.  Black told Cindy Uhlinger that Turner had instructed her to get rid of Yvonne Loskot. Ex. G, Uhlinger Interviews.**

63.    Turner never said that Black should reduce Loskot's hours because she made too much money.

**Disputed.  Turner told Black that she should get rid of Loskot because she was getting too old and Black could hire two younger people to replace her.  Ex. F, Black Affidavit; Ex. B, Black Dep. at 10:16-11:4, 13:13-18, 16:21-17:6, 160:1-18.  Black told Cindy Uhlinger that Turner had instructed her to get rid of Yvonne Loskot. Ex. G, Uhlinger Interview.**

64.    Turner never told Black to specifically cut Loskot's hours but rather told her to cut everyone's hours.

**Disputed in part.  Turner told Black that she could replace Loskot with two people because of her high rate of pay, meaning that Loskot made too much money.  Ex. B, Black Dep. at 11:3-4, 13:17-18; Ex. F, Black Affidavit.**

65.   Turner did not think that Loskot made too much money. Loskot had a lot of experience, which results in sales.

**Disputed in part.  Turner told Black that she could replace Loskot with two people because of her high rate of pay, meaning that Loskot made too much money.  Ex. B, Black Dep. at 11:3-4, 13:17-18; Ex. F, Black Affidavit.  Undisputed that Loskot had a lot of experience, which resulted in sales.**

66.   Black was investigated and terminated in 2005 for integrity issues.

**Undisputed that Black was terminated and that Wal-Mart's alleged reason was theft.**

67.   An investigation by Jeff Bonora, the district loss prevention supervisor at the time, revealed that Black stole money and merchandise from a charity organization during a Wal-Mart fund raiser.

**Undisputed that Bonora investigated Black and claimed he had evidence that she had committed theft.**

68.   Black admitted that she took $420 from the Wal-Mart fund raiser because she was having financial problems and that she took leftover merchandise including a tent and a cooler.

**Disputed.  Black denies making such an admission.  Ex. B, Black Dep. at 115:13-17.**

69.   Black signed a note stating that she owed $420 of restitution to Wal-Mart that would be paid in monthly installments.

**Undisputed.**

70.   Black also wrote out a statement, admitting that she had taken money and merchandise from the fund raiser.

      **Disputed.  Black denies making such a statement.  Ex. B, Black Dep. at 99:8-10.**

71.   Wal-Mart pressed criminal charges against Black.

      **Undisputed.**

72.   Black pled guilty to petit larceny.

      **Undisputed that Black made such a plea on the advice of the court.  Ex. B, Black Dep. at 116:25-118:3.**

73.   Jeff Bonora has worked for Wal-Mart approximately ten years.

      **Undisputed.**

74.   Bonora's started as an in-store loss prevention associate and later became a district loss prevention supervisor.

      **Undisputed.**

75.   Bonora's training for the position of district loss prevention supervisor included on the job shadowing with different supervisors throughout the country.

      **Undisputed.**

76.   Bonora was trained in conducting an investigation, including gathering and analyzing records and a day-long class on the Wicklander-Zulawski interview techniques.

      **Undisputed.**

77.   In 2005, Bonora's job duties included managing the team of in-store loss prevention associates for anywhere from seven to 22 stores in Missouri.

      **Undisputed.**

78.   Prior to his investigation of Loskot, Bonora had conducted other investigations in Vision Centers and had reviewed Vision Center reports on approximately a weekly basis.

**Undisputed.**

79.   Typically, Bonora conducted an investigation when an issue was brought to his attention. Bonora would then start asking questions and create a case file with relevant documents and his notes. If he could not answer those questions, he would interview those involved.

**Undisputed.**

80.   Bonora involves only people necessary for him to conduct a thorough investigation.

**Undisputed.**

81.   It is not unusual for the person being interviewed to not know the subject of the investigation.

**Undisputed.**

82.   Pursuant to Wal-Mart policy, the person being interviewed is asked to come to the office to have a conversation and is seated closest to the door, while the person interviewing them sits in front of them to facilitate a conversation. The interviewee is told they are free to leave at any time, that they can get a drink of water or use the restroom whenever they need.

**Disputed in part.  Undisputed that this is Wal-Mart's policy, but disputed that this is what Jeff Bonora told Yvonne Loskot.  When Gary McClain called Loskot into the office, Bonora asked if she needed to get a drink or go to the bathroom before the meeting started, but his implication was that she would not be able to leave the room once the meeting started.  Bonora never told Loskot that she was free to leave**

**at any time, and his words and actions made her feel that she was not free to leave.**

**Ex. Q, Loskot Affidavit.**

83.    The interview implements Wal-Mart's core belief of respecting the individual.

**Disputed.  Bonora's interview methods are very disrespectful.  *See* Ex. B, Black Dep. at 96:16-22, 97:10-98:2; Ex. A., Y. Loskot Dep. at 109:3-24, 110:4-10; Ex. Q, Loskot Declaration.**

84.    Bonora will introduce himself and state that he is involved in an investigation of the store into some things that could cause the company a loss.

**Undisputed.**

85.    Bonora does not always show the documents he has reviewed to the person being interviewed.

**Undisputed.**

86.    He tries not to intimidate the interviewee with a lot of documents, and tries to keep them from becoming defensive or nervous in order to better facilitate the conversation he is trying to have.

**Disputed.  Bonora frequently raises his voice during interrogation or termination meetings and he behaves in an intimidating manner.  Ex. B, Black Dep. at 96:16-22, 97:10-98:2; Ex. Q, Loskot Declaration.**

87.    At the end of the interview, the associate is given an opportunity to write a statement.

**Disputed.  Yvonne Loskot was not asked nor given an opportunity to write a statement after Bonora's interrogation.  Ex. Q, Loskot Declaration.**

88.    At the conclusion of an investigation, Bonora also prepares a statement for the file.

**Undisputed.**

89.     Bonora only has authority to discipline or terminate his direct reports.

        **Undisputed.**

90.     Bonora recommends to the store manager whether or not to terminate the employment of
        the associate being interviewed.

        **Undisputed.**

91.     The store manager can disagree with the recommendation and has the final authority and
        responsibility to fire associates.

        **Undisputed that this may be true in theory, but Store Manager Gary McClain has
        never contradicted Jeff Bonora's recommendation that an employee be terminated
        and he has always assumed that the information Bonora gave him supporting the
        recommendation was true.  Ex. H, McClain Dep. at 31:7-21.**

92.     After Black's termination, Turner spent part of his time managing the DeSoto Vision
        Center.

        **Undisputed.**

93.     In this role, Turner, reviewed layaway reports.

        **Undisputed.  As District Manager, Turner routinely reviewed layaway reports with
        Pam Black, so he was already familiar with the reports.  Ex. B, Black Dep. at 55:17-
        57:5.**

94.     He found layaway reports that listed items that were past due.

        **Disputed in part.  Turner was already aware of past due layaway items *before*
        Black's termination.  Ex. B, Black Dep. at 55:17-57:5.**

95.     Extending the layaways made Black's sales appear larger because a layaway is recorded
        as a sale. Black's bonuses were based on her sales and her profitability.

**Undisputed.**

96.   Upon closer review, Turner found orders without any merchandise, that did not have a
      down payment or that lacked certain patient information.

      **Disputed.  Turner's involvement in Loskot's termination was motivated by his
      discriminatory animus, and his testimony regarding problems with layaway reports
      is suspect, particularly since Wal-Mart destroyed the reports.  Ex. L, Wal-Mart's
      Responses to EEOC's Requests for Admissions #7.**

97.   When Turner found that there were orders without any merchandise, Turner contacted
      Bonora on September 19, 2005.

      **Undisputed that Turner contacted Bonora.  Turner's involvement in Loskot's
      termination was motivated by his discriminatory animus, and his testimony
      regarding problems with layaway reports is suspect, particularly since Wal-Mart
      destroyed the reports.  Ex. L, Wal-Mart's Responses to EEOC's Requests for
      Admissions #7.**

98.   Turner also gave Bonora the BOSS documentation associated with the orders.

      **Undisputed.**

99.   The BOSS documentation identified what associates handled and who initially entered
      the orders in question.

      **Disputed.  The associate name shown in the BOSS system is not necessarily the
      name of the associate who handled the order.  Ex. C, Bonora Dep. at 244:11-15.**

100.  Turner involved Bonora because after Black's termination, he wanted to ensure that there
      were no other things being done improperly.

**Disputed.  Turner's testimony is untruthful and a pretext to hide his discriminatory intent.**

101.    Turner was not sure if Black was creating fictitious layaways and generally questioned whether there were other things she had done that he had been missing.

**Disputed.  Turner's testimony is untruthful and a pretext to hide his discriminatory intent.  Turner specifically told Bonora to investigate Yvonne Loskot.  Ex. S, Investigator On-Site Notes at 669.**

102.    He turned to loss prevention because he no longer had a manager to ask about the reports.

**Disputed.  Turner's testimony is untruthful and a pretext to hide his discriminatory intent.**

103.    Turner did not generally discuss these issues with associates because if the associate becomes suspicious about Turner's motive, it can be difficult to work with that person in the future. Turner did not want the associates to think that he was second guessing their work.

**Disputed.  Turner's testimony is untruthful and a pretext to hide his discriminatory intent.**

104.    When loss prevention conducts the investigation, Turner can still act as a sounding board for the associates and his relationship with them is not compromised.

**Disputed.  Turner's testimony is untruthful and a pretext to hide his discriminatory intent.**

105.    Turner was not involved in the investigation after he gave Bonora the BOSS printouts and layaway reports.

**Disputed.  Bonora and Turner were seen working together in the Vision Center for two weeks after Pam Black's termination.  Ex. I, Hyslop Dep. at 43:2-45:12.  Bonora admitted that he updated Turner on the status of his investigation and consulted with Turner before firing Loskot.  Ex. J, Bonora Affidavit.**

106.   Bonora was the primary person involved in the investigation of Loskot.

**Disputed.  John Turner, Jeff Bonora and Gary McClain were the managers involved in the decision to terminate Loskot.  Ex. M, Wal-Mart's Responses to EEOC First Interrogatories #2.**

107.   McClain did not know the subject of Bonora's investigation.

**Undisputed.**

108.   McClain assisted Bonora by providing him necessary access to computers and/or files in the store but was not actually involved in the investigation.

**Undisputed.**

109.   The day after Bonora spoke to Turner, Bonora went to the DeSoto Wal-Mart and reviewed layaway reports for the prior 30 days and found orders for which there were no glasses and/or no customers.

**Disputed.  Wal-Mart has destroyed the layaway reports in question, so it is impossible to verify Bonora's testimony.  Ex. L, Wal-Mart's Response to EEOC's Requests for Admissions at #7.**

110.   Bonora found that several patients who were listed on the layaway report had empty files, and he found empty layaway bins for other orders on the report.

**Disputed.  Wal-Mart has destroyed the layaway reports in question, so it is impossible to verify Bonora's testimony.  Ex. L, Wal-Mart's Response to EEOC's Requests for Admissions at #7.**

111.    Bonora discovered that the two operators responsible for the orders on the reports were Black and Loskot, which led to looking into transactions involving Loskot since Black had already been terminated.

**Disputed.  Bonora looked into transactions involving Loskot because John Turner told him to look at transactions involving Loskot.  Ex. S, Investigator On-Site Notes at 669.**

112.    His review included the electronic journal, invoices for the orders and lab orders from the BOSS system relating to Loskot or her family members.

**Disputed.  Wal-Mart receipts, which should have been reflected in the electronic journal, show payment for items in the BOSS system for which Bonora claims no payment was made.  *Compare* Ex. CC, Order # 1002056 BOSS Report & Supporting Documents at EEOC 00846A, *with* Def.'s Ex. 12 at 438 (noting "No POS Transaction" in Bonora's handwriting).  This suggests that Bonora may not have actually reviewed the electronic journal.**

113.    Because Bonora could not print certain information from the BOSS system, he made handwritten notes on the print outs relating to the order.

**Undisputed.**

114.    Bonora compared the orders in the BOSS system with the electronic journal to determine whether orders had been pulled to register.

**Disputed.  Wal-Mart receipts, which should have been reflected in the electronic journal, show payment for items in the BOSS system for which Bonora claims no payment was made.  *Compare* Ex. CC, Order # 1002056 BOSS Report & Supporting Documents at EEOC 00846A, *with* Def.'s Ex. 12 at 438 (noting "No POS Transaction" in Bonora's handwriting).  This suggests that Bonora may not have actually reviewed the electronic journal.**

115.     The investigation revealed orders involving Loskot and/or her family for which there was no evidence of payment. For example, one order showed an unpaid balance of $86.38.

**Disputed.  The BOSS system actually shows full payment for this order.  Ex. DD, Order # 1173656 BOSS Report & Supporting Documents.**

116.     Another order was dispensed to Loskot on 8/13 but was refunded on 9/13 and remade. The difference in price from the original order of $56.70 and the remake, which cost $87.30, was never pulled to register and had not been paid. This order was refunded and remade on 10/25; this second remake cost $117.30. The difference from the original was also not pulled to register and was not paid.

**Disputed.  Loskot produced a receipt showing payment of the price difference on 9/13/03.  Ex. FF, Order # 1191544 BOSS Report & Supporting Documents.  The 10/25/03 order was cancelled and never filled, so no payment was required.  Ex. GG, Order # 1192798 BOSS Report.**

117.     Another order was dispensed on 11/15 but never pulled to register.

**Undisputed.  This transaction from 2003 is one of only two transactions for which Loskot is unable to find her receipts and is unable to remember what happened with the transaction.  Ex. Q, Loskot Declaration.**

118.   One order was dispensed 11/23/2003, refunded and remade on 8/21/2004, and not pulled to register with an outstanding balance of $127. It was then refunded and remade again on 8/21/2005. This was an excessively long remake, and suspicious because of the multiple cancellations of the order.

**Disputed.  There was no remake on 8/21/04.  The BOSS system shows that there were three orders placed for Yvonne Loskot on 8/21/04; two of the orders were cancelled and the third was paid in full.  Ex. HH, Order # 1005154 BOSS Report; Ex. II, Order # 1005155 BOSS Report; Ex. JJ, Order # 1005156 BOSS Report & Supporting Documents.**

119.   Several other orders involved remakes that had outstanding balances that were never pulled to register.

**Disputed.  Both pages of deposition testimony cited (Def.'s Ex. 13 at 226:1-5, 231:2-18) refer to the *same transaction* – the transaction documented on Defendant's Ex. 12 at 423, which is Order # 1001049.  These citations do not support the proposition that "several other orders" had outstanding balances that were not pulled to the register.  Moreover, this order was a remake for which Loskot had paid the original order in full and received only a four dollar discount on the remake.  Ex. KK, Order # 1001049 BOSS Report.**

120.    Another order referenced a warranty repair on 12/15/97, which was nearly a year after

they were ordered. This is an excessively long time for a warranty repair and raised

questions for Bonora.

**Disputed.  Bonora admitted that this transaction was outside the scope of his**

**investigation, as it had taken place many years before.  Ex. C, Bonora Dep. at 248:9-**

**12.**

121.    Another order to Loskot's granddaughter was not pulled to register and had an

outstanding balance of $20.

**Disputed.  Again, this transaction, from July 1997, was beyond the scope of**

**Bonora's investigation, and there is no evidence to show that this order was not**

**ultimately paid for or cancelled.  Ex. C, Bonora Dep. at 248:9-12.**

122.    An order to Loskot's son was never pulled to register and had an outstanding balance of

$139.

**Disputed.  This order, # 1001538 dated 3/19/05, was a remake of an earlier order**

**that was paid in full on 1/29/05, and no additional payment would be expected.  Ex.**

**BB, Order # 1001538 BOSS Report & Supporting Documents; Ex. AA, Order #**

**1001189 BOSS Report & Supporting Documents.  Moreover, Def.'s Ex. 14 as cited is**

**irrelevant to this proposed fact.**

123.    There were also orders that were remade months after they were originally dispensed as a

result of "scratches." The length of time between the original order and the remakes

raised questions to Bonora during his investigation.

**Disputed.  The BOSS Screen Prints produced by Defendant do not support**

**Bonora's notes regarding "scratches".  No testimony from Bonora is cited.**

**Moreover, the only transactions in Def.'s Ex. 14 that reflect "scratches" are from 1997, long before the supposed scope of Bonora's investigation.  *See* Def.'s Ex. 14 at 447 and 448.  In addition, it is completely unclear that there was a substantial length of time between the original order date and the remake date, or that these two transactions do not actually reflect one order.  *See* Def.'s Ex. 14 at 447 (the exam date was 7/3/97, and the order date was the same); Def.'s Ex. 14 at 448 (the order date was 7/4/97, only one day after the transaction on p. 447).**

124.    Another order to Tony Burg was dispensed on 5/16/2005 but not pulled to register, which left an outstanding balance of $174.

**Disputed.  This order, #1002056 dated 5/7/05, was a remake of the lenses from Order #1001189, replacing $27.50 lenses with $40 bifocal polarized lenses.  The BOSS system shows that the order was ready on 5/13/05, and Loskot's receipt shows that she paid for the more expensive lenses on 5/14/05.  The frame remained the same, and would not have been refunded or paid for again.  Ex. CC, Order # 1002056 BOSS Report & Supporting Documents; Ex. AA, Order # 1001189 BOSS Report & Supporting Documents.**

125.    There were also orders to Loskot's grandchildren involving Project Insight.

**Undisputed.**

126.    One order showed a transaction worth $122 that was billed to Project Insight; however, the patient's birth date was 1954, which is not an underprivileged child.

**Disputed.  This order, # 1000238, for Anthony Burg (Loskot's grandson) dated 11/11/04 was clearly marked "Project Insight".  Ex. X, Order #1000237 BOSS Reports & Supporting Documents.  Although the BOSS system shows an incorrect**

**birthdate of 1954, only a little bit of investigative work would have revealed that a patient named Tony Burg had the same home phone number as Anthony, resided in Blackwell, MO (as did Anthony), and had a birthdate of 1958, suggesting, at the very least, Anthony's identity was unclear and that perhaps further investigation was warranted.  Ex. X, Order #1000237 BOSS Reports & Supporting Documents. Moreover, it is unclear when or how Anthony Burg's birthdate was changed in the BOSS system, because a Vision Center order from 2003 shows that Anthony Burg is a minor.  Ex. X, Order #1000237 BOSS Reports & Supporting Documents at EEOC 00787.  Even Yvonne Loskot's own birthdate was incorrect on one of the BOSS system orders.  Ex. KK, Order # 1001049 BOSS Report at 3536 (showing a birth year of 1948 when the correct year is 1938).**

127.   Based on the information Bonora had, this order appeared to be for Loskot's adult son, Tony Burg.

**Disputed.  Bonora had full access to the BOSS system, which had records showing that Loskot's son, Tony Burg, was a different patient.  Ex. CC, Order # 1002056 BOSS Report & Supporting Documents.  The BOSS system also had records showing that Anthony Burg was a minor.  Ex. X, Order #1000237 BOSS Reports & Supporting Documents at EEOC 00787.**

128.   Although two other Wal-Mart employees received Project Insight services, Loskot and Black proposed and authorized this use of Project Insight.

**Disputed.  The use of Project Insight services for needy, uninsured children of employees was proposed by Black and authorized by Turner.  Loskot neither**

**proposed nor authorized this use.  Ex. B, Black Dep. at 73:19-77:5, 78:6-18; Ex. E, Pennock Interview.**

129.   When it appeared that there was no payment for an order in the BOSS system, Bonora checked the point of sale system at the store to determine if that order number came up anywhere in the store to verify whether or not there was payment.

**Disputed.  Loskot produced receipts for Vision Center purchases for which Bonora claimed no receipts or point of sale (POS) transactions existed.  Ex. AA, Order # 1001189 BOSS Report & Supporting Documents; Ex. CC, Order # 1002056 BOSS Report & Supporting Documents; Ex. DD, Order # 1173656 BOSS Report & Supporting Documents; Ex. FF, Order # 1191544 BOSS Report & Supporting Documents.**

130.   Bonora also looked at purchases Loskot made on the days of the questionable orders, and glasses were not included in her purchases.

**Disputed.  Loskot produced receipts for Vision Center purchases for which Bonora claimed no receipts or point of sale (POS) transactions existed.  Loskot produced fsreceipts for Vision Center purchases for which Bonora claimed no receipts or point of sale (POS) transactions existed.  Ex. AA, Order # 1001189 BOSS Report & Supporting Documents; Ex. CC, Order # 1002056 BOSS Report & Supporting Documents; Ex. DD, Order # 1173656 BOSS Report & Supporting Documents; Ex. FF, Order # 1191544 BOSS Report & Supporting Documents.**

131.   He also reviewed Loskot's purchase history for 2005 to determine whether or not there were payments for certain orders at issue, and he found no evidence of payment.

**Disputed.  The purchase history report** *does show* **Loskot's payments for orders Bonora says were at issue.** *Compare* **Ex. AA, Order # 1001189 BOSS Report & Supporting Documents at EEOC 00846B,** *with* **Def.'s Ex. 29 at 461;** *compare* **Ex. CC, Order # 1002056 BOSS Report & Supporting Documents at EEOC 00846A (5/14/05 receipt showing TR# 03332 and time 14:38:05),** *with* **Def.'s Ex. 29 at 463 (showing Transaction #3332 and time 1438).**

132.    Following a two week investigation, Bonora gathered all of the information relating to the questionable orders and decided to have a conversation with Loskot regarding issues that remained unanswered.

**Disputed to the extent that Bonora's interrogation of Loskot is described as a "conversation".** *See* **Ex. Q, Loskot Declaration; Ex. A., Y. Loskot Dep. at 109:11-24. Bonora frequently raised his voice during interrogation or termination meetings. Ex. B, Black Dep. at 96:16-22, 97:10-98:2.**

133.    Bonora did not expect Loskot to tell him any specific information during the interview; he merely wanted to have a conversation with her about questions he had about the orders.

**Disputed to the extent that Bonora's interrogation of Loskot is described as a "conversation".** *See* **Ex. Q, Loskot Declaration; Ex. A., Y. Loskot Dep. at 109:11-24. Bonora frequently raised his voice during interrogation or termination meetings. Ex. B, Black Dep. at 96:16-22, 97:10-98:2.**

134.    Gary McClain, Jeff Bonora and Leisha Layton were present at the interview with Loskot on October 3, 2005.

**Undisputed.**

135.   It is standard Wal-Mart procedure to have several managers attend interviews to act as
       witnesses who protect both the associate and the interviewer.

       **Undisputed.**

136.   Layton was present because the only other female salaried member of management at the
       DeSoto store was Loskot's direct supervisor, and Bonora wanted to protect Loskot's
       privacy in the event the details of his investigation were inaccurate.

       **Undisputed that Layton was present because she was the only other female salaried
       member of management.  Disputed that Bonora wanted to protect Loskot in any
       way.  Ex. Q, Loskot Declaration; Ex. A., Y. Loskot Dep. at 109:11-24; Ex. B, Black
       Dep. at 96:16-22, 97:10-98:2.**

137.   Bonora told Loskot that she could leave the room and was free to use the restroom or get
       a drink of water if she needed.

       **Undisputed.**

138.   Bonora told her that he wanted to talk to her about some things occurring in the Vision
       Center that were brought to his attention and that may potentially cause the company a
       loss.

       **Undisputed.**

139.   He asked her to talk to him about transactions involving her and her family members that
       he found questionable; Loskot said that some of the orders were refunds or remakes and
       that she had receipts for everything she purchased.

       **Disputed.  The memo states that Bonora repeatedly demanded that Loskot "tell me
       something" without telling her what he was talking about.  He then asked Loskot**

**why she didn't pay for her family's glasses.  He never engaged in a conversation with Loskot.  Def.'s Ex. 31; Ex. A., Y. Loskot Dep. at 109:11-24.**

140.    Bonora questioned Loskot about glasses given to Carol Crocker, a former Wal-Mart employee, for which there was no payment.

**Undisputed that Bonora questioned Loskot.  Disputed that Carol Crocker received glasses without payment.  Ex. A., Y. Loskot Dep. at 123:8-15.**

141.    Bonora asked Loskot about Project Insight because the order that appeared to be for her son was questionable.

**Undisputed that Bonora questioned Loskot.**

142.    Bonora offered to show Loskot the documents he had at the interview; however, she declined to review them and stated that she had receipts for everything she purchased.

**Disputed.  Ex. A., Y. Loskot Dep. at 109:21-24, 122:24-123:3; Ex. Q, Loskot Declaration.**

143.    Bonora did not ask her to stay to go over the transactions after Loskot indicated that she had all of her receipts. He would not force her to stay when she was ready to leave the interview, and he had no reason to think that she would not return to discuss the orders.

**Disputed.  Bonora *never* asked Loskot to go over the transactions with him, before *or* after Loskot stated that she had receipts.  Ex. A, Loskot Dep. 110:18-111:2, 146:15-23.**

144.    Bonora asked Loskot to bring the receipts she referenced to Wal-Mart on October 5, 2005, since October 4 was her day off.

**Disputed in part.  Bonora did ask Loskot to bring in the receipts on October 4. When Loskot informed Bonora that October 4 was her day off, Bonora agreed to**

**allow Loskot to bring in the documents on October 5.  Ex. A, Y. Loskot Dep. at 111:1-6.**

145.    The next day, October 4, 2005, Loskot left a manila envelope with a letter to Gary McClain, the store manager, a request for a leave of absence and receipts at Wal-Mart's back office.

**Undisputed.  Loskot's leave of absence request was signed and approved by her supervisor before Loskot took it to the office to leave for McClain.  Ex. U, Leave of Absence Request; Ex. A., Y. Loskot Dep. at 152:9-153:22**

146.    The receipts were copies of all of Loskot's charges for her children, grandchildren and husband for the prior three years.

**Undisputed that Loskot left all of the receipts she had been able to find.  Ex. A., Y. Loskot Dep. at 152:9-153:22; Ex. SS, E. Loskot Dep. at 36:17-37:14**

147.    Loskot copied the President of Wal-Mart in Bentonville, Arkansas on the letter to McClain.

**Undisputed.**

148.    Loskot did not come back to Wal-Mart on October 5, 2005, to meet with Bonora.

**Undisputed.  Loskot was emotionally distressed, had been granted leave, and was unable to meet with Bonora. Ex. A, Y. Loskot Dep. at 170:19-171:4.**

149.    After reviewing the materials Loskot left in the office, Bonora concluded that the receipts did not pertain to the orders at issue.

**Disputed.  It is doubtful that Bonora even looked at the receipts produced by Loskot.  If he had, he would have noticed that a receipt dated 5/14/05 matched Order # 1002056, which he had questioned.  *Compare* Def.'s Ex. 33 at 484 *with* Def.'s**

**Ex. 12 at 438.  He also would have been able to match up another receipt for Tony Burg with Order # 1001538 (a remake of the order on the receipt), which he had questioned.  *Compare* Def.'s Ex. 33 at 488 *with* Def.'s Ex. 12 at 434.**

150.   Because the store manager must approve or deny all requests for leaves of absence, Loskot's request for a leave of absence was not properly signed.

**Disputed.  Ex. V, Leave of Absence Policy at A00693-693 [Dep. Ex. 54]; Ex. U, Leave of Absence Request.**

151.   Bonora contacted Wal-Mart's corporate legal department for advice on handling Loskot's failure to return to the interview and her request for a leave of absence.

**Undisputed.**

152.   The legal department indicated that based on the evidence and documentation from the investigation and Loskot's refusal to cooperate with the investigation, Loskot's leave of absence request should be denied and her employment terminated immediately.

**Undisputed.**

153.   On October 5, 2005, Bonora tried contacting Loskot. He called and left a message that her request for a leave of absence was denied and asked her to return so they could discuss the circumstances in person.

**Disputed.  Ex. SS, E. Loskot Dep. at 61:18-24; Ex. A., Y. Loskot Dep. at 171:5-17.**

154.   Bonora later left a message that a decision had been made regarding her termination.

**Disputed.  After Bonora's message on October 5, Loskot's husband faxed a letter to Bonora and Gary McClain asking that any further communications from the store be in writing.  Ex. W, E. Loskot Fax to J. Bonora [Dep. Ex. 8].  The next communication Loskot received from Wal-Mart was a letter from Bonora and**

**McClain stating that her employment was terminated effective October 5, 2005.  Ex. VV, TerminationLetter [Depo Ex. 10]; Ex. A., Y. Loskot Dep. at 184:12-14.**

155.    Loskot did not speak to Bonora when he called on October 5, 2005 and did not return his call.

**Disputed in part.  As written, this fact suggests that Loskot was home when Bonora called and that she refused to talk to him, which is untrue.  Bonora's message said that Loskot would "suffer the consequences," and Loskot remained so emotionally distraught at this point from Bonora's interrogation that she would have been unable to return the call.  Ex. A., Y. Loskot Dep. at 171:8-172:2.**

156.    Loskot never had a discussion with Bonora or McClain about the materials she left at the back office on October 4, 2005.

**Undisputed.  Loskot was emotionally distraught after Bonora's interrogation and her doctor instructed her not to return to work.  Ex. T, Doctor's Note]; Ex. U, Leave of Absence Request; Ex. SS, E. Loskot Dep. at 35:23-36:3.**

157.    Loskot never spoke to Bonora, McClain or anyone else at Wal-Mart about the orders at issues or about having receipts that would verify transactions involving Loskot and/or her family members.

**Disputed.  Loskot talked to Bonora and McClain during Bonora's interrogation of her.  During that interrogation, Bonora never specified which transactions he was questioning or showed her any documentation regarding the orders in question.  Ex. A., Y. Loskot Dep. at 109:16-18, 21-24, 122:24-123:3.**

158.    Loskot never verified that the receipts that she left at Wal-Mart's back office matched the orders Bonora was questioning.

**Undisputed.  Bonora also never informed Loskot of which transactions he was questioning, therefore Loskot simply provided all of the receipts she was able to locate at the time.  Ex. A., Y. Loskot Dep. at 147:8-148:18.**

159.    Bonora concluded that Loskot had engaged in the unauthorized removal of company property because documentation indicated that merchandise was ordered but no payment had been processed through the register.  He did not have any contrary explanation for these orders, and Loskot was unwilling to participate in a further interview, show documentation of payment or discuss the transactions.

**Disputed.  Loskot participated fully in Bonora's interrogation, and she offered to bring in her receipts, which she did.  Bonora did not identify particular transactions or show Loskot any documentation regarding the transactions in question, so there was nothing further for Loskot to discuss.  Ex. A., Y. Loskot Dep. at 147:8-148:18.**

160.    Bonora recommended that she be terminated, and McClain made the decision to terminate her employment.

**Undisputed.**

161.    McClain sent a certified letter to Loskot stating that due to unresolved issues and her lack of cooperation with the investigation, the only course available to him was to terminate her employment as of October 5, 2005.

**Undisputed.**

162.    McClain also signed Loskot's exit interview, which stated that she was terminated for "gross misconduct/theft." It referenced the unauthorized removal of company property when Loskot processed optical orders for herself and her family without receiving proper payment.

**Undisputed that this is what the exit interview, signed by McClain, says.**

163.   On October 6, Loskot's husband, Emil, sent a fax to Bonora, stating that any further

communications must be in writing.

**Undisputed.**

164.   On the same day, Emil sent a second fax to McClain, suggesting ways that he could have

handled the situation and noting that he had been trying to get Loskot to retire from her

job at Wal-Mart.

**Undisputed.**

165.   Loskot and her husband also drafted memos to their file about her termination.

**Undisputed.**

166.   Although these memos are dated October 3 or October 4, 2005, they reference events on

October 10, so it is unclear when the Loskots actually drafted these memos.

**Undisputed.**

167.   Loskot also wrote a memo to her file in November 2005 complaining about receiving

breaks at Wal-Mart.

**Disputed in part.  The memo was actually written by Loskot's husband.  Ex. A., Y.**

**Loskot Dep. 146:4-147:12.**

168.   Bonora did not discuss the decision to terminate Loskot with Turner.

**Disputed.  Ex. J, Bonora Affidavit.**

169.   As district manager, Turner would not be consulted about whether or not to terminate an

associate's employment.

**Disputed in part.  Regardless of normal practice, Bonora consulted with Turner regarding the findings of his investigation before terminating Loskot's employment. Ex. J, Bonora Affidavit.**

170.   Turner was not involved in the recommendation to terminate Loskot or her actual termination.

**Disputed.  Ex. J, Bonora Affidavit; Ex. M, Wal-Mart's Responses to EEOC First Interrogatories #2.**

171.   Bonora eventually called Turner and told him that he would be terminating Loskot's employment.

**Undisputed that Bonora talked to Turner about the decision to terminate Loskot.**

172.   Wal-Mart did not hire younger employees to replace Loskot.

**Disputed.  Every employee hired or transferred to work in the Vision Center at Wal-Mart Store #152 (DeSoto) after Loskot's termination in October 2005 was 40 years old or younger.  Ex. R, Wal-Mart's Responses to EEOC's Third Interrogatories.**

173.   Danielle Hyslop began working at Wal-Mart in November 2002 in the jewelry department.

**Undisputed.**

174.   Hyslop learned about an opening in the DeSoto Vision Center from her roommate, who was Pam Black's niece. She applied for and got the position at the Vision Center in July or August of 2005.

**Undisputed.**

175.   During her deposition, Loskot could match only one of the receipts that she left at Wal-Mart's back office on October 4, 2005, with the orders that Bonora was questioning. **Undisputed that during the afternoon of her deposition, after several hours of testimony and during which she was emotionally frazzled, Loskot was unable to sort through many pages of documents on the spot and match together receipts with BOSS reports that she had never before seen.  Ex. A., Y. Loskot Dep. at 202:17-204:17.**

176.   Although Loskot identified a receipt for one of the orders in question, that order was remade and Loskot could not identify a receipt for the difference in price between the original order and the remake. **Undisputed that during the afternoon of her deposition, after several hours of testimony and during which she was emotionally frazzled, Loskot was unable to sort through many pages of documents on the spot and match together receipts with BOSS reports that she had never before seen.  Ex. A., Y. Loskot Dep. at 202:17-204:17.**

177.   She could not identify any other receipts that matched with the orders in question. **Undisputed that during the afternoon of her deposition, after several hours of testimony and during which she was emotionally frazzled, Loskot was unable to sort through many pages of documents on the spot and match together receipts with BOSS reports that she had never before seen.  Ex. A., Y. Loskot Dep. at 202:17-204:17.**

178.   The credit card statements retained by Loskot and her husband also did not verify payment for the orders in question, despite testifying that these statements would account for all of their orders.

**Disputed.  The Loskots's credit card statements do verify payment of some of the orders on which Bonora alleged no payment was made.  Order # 1173656 BOSS Report & Supporting Documents; Ex. BB, Order # 1001538 BOSS Report & Supporting Documents; Ex. AA, Order # 1001189 BOSS Report & Supporting Documents; Ex. CC, Order # 1002056 BOSS Report & Supporting Documents.**

179.   The sole basis for Turner's alleged statement regarding her termination is from Black.

**Undisputed.**

180.   Loskot never reported Turner's alleged statement to any member of management at Wal-Mart.

**Undisputed.  A member of Wal-Mart's management Pam Black, was the person *who told Loskot* about Turner's statement, and therefore management was already aware of the situation.  Ex. A., Y. Loskot Dep. at 242:18- 244:7.**

181.   Loskot never spoke to anyone at Wal-Mart about the alleged statement.

**Disputed.  Loskot talked to Pam Black about Turner's statement.  Ex. A., Y. Loskot Dep. at 242:18- 244:7.**

182.   Loskot did not utilize Wal-Mart's open door policy despite being fully aware of the policy, which instructs associates to a manager or supervisor at any time with any concerns or questions.

**Undisputed.  Until Loskot was called in to Bonora's interrogation, which was emotionally distressing, and then terminated shortly thereafter, there was no discriminatory treatment to report.**

183.  Loskot knew about Wal-Mart's policy against discrimination and harassment but never reported Turner's alleged statement.

**Undisputed.**

184.  Loskot filed a claim for unemployment benefits with the Missouri Division of Employment Security.

**Undisputed.**

185.  Loskot attested that she was terminated by McClain for "lack of cooperation with the investigation."

**Disputed.  Loskot did *not* say that this is the reason she was terminated.  The form asked Loskot to state "The reason *he/she gave me* was....", and Loskot wrote "Lack of cooperation with the investigation", which was the reason *given by McLain* in the termination letter.   Ex. N, Div. of Emp. Security File at 34 [Dep. Ex. 28]; Ex. VV, Termination Letter.**

186.  She further attested that she "refused to return [to Wal-Mart] for further questioning and harassment."

**Undisputed.  Loskot also told the Division of Employment Security that she requested a leave of absence at the time because she was "very upset".   Ex. N, Div. of Emp. Security File at 36.**

187.  In response to Loskot's claim, Wal-Mart stated that she was terminated after an investigation revealed that she had provided Project Insight services to an adult family

member, that she had processed orders for her family for which there was no payment and that despite being given an opportunity to provide proof of payment, the documentation she provided did not prove payment for the items in question.

**Disputed.  This statement is misleading because it suggests that only one of the orders in question was related to Project Insight.  The actual text of the document makes clear that each of the charges in question, two dated 11-11-04 and one dated 11-8-09, were related to Project Insight.  *No other charges or orders are mentioned.*  Ex. N, Div. of Emp. Security File at 37.**

188.  In an interview with the EEOC on January 9, 2008, Loskot stated that "she couldn't take it anymore and decided not to go back" to meet with Bonora or McClain. The interview notes do not mention her leave of absence or an illness as the reason for her failing to return.

**Disputed.  Loskot's statement that "she couldn't take it anymore" can easily be interpreted as a reference to her distraught emotional state.  Ex. A., Y. Loskot Dep. at 170:19-171:4.**

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

**A.**     **John Turner Wanted to Get Rid of Yvonne Loskot Because of Her Age**

1.     Yvonne Loskot was born in May 1938 and she was 67 years old in May 2005.  Ex. A., Y. Loskot Dep. at 11:19-20.

2.     Yvonne Loskot was employed by Wal-Mart for ten years.  Ex. A., Y. Loskot Dep. at 19:10-11.  At the time of her termination, she earned $17.95 per hour and was the highest paid employee at Wal-Mart's DeSoto Vision Center.  Ex. R, Wal-Mart's Responses to EEOC's Third Interrogatories.

3.      In May 2005, John Turner told Pam Black that Yvonne Loskot was too old and that

Black could replace Loskot with two younger workers.  Ex. B, Black Dep. at 87:13-

88:8.  Turner made these comments during a discussion about reducing payroll costs

in the DeSoto Vision Center.  *Id.*

4.      Two weeks later, Turner told Black again that she should get rid of Loskot because

she was getting old and could be replaced with two younger people.  Ex. F, Black

Affidavit [Dep. Ex. 65]; Ex. B, Black Dep. at 88:1-23.

5.      After Turner made these comments, Black told Yvonne Loskot that Turner had told

her that she should terminate Loskot because she could be replaced with two younger

employees.  Ex. A., Y. Loskot Dep. at 173:22-175:7.  Black also told another vision

center employee, Cindy Uhlinger, that Turner told her to get rid of Loskot.  Ex. G,

Uhlinger Interview.

6.      Black refused to get rid of Loskot and she addressed the store's payroll issues by

reducing employees' hours evenly across the board.  Ex. B, Black Dep. at 16:24-25.

**B.      Project Insight**

7.      In 2004, the year that Yvonne Loskot's grandchildren and the children of other Wal-

Mart employees participated in Project Insight, the Project Insight campaign ran from

September 13 through November 13. Ex. TT, 2004 Project Insight Guidelines.

8.      Vision Center District Managers were encouraged to make sure that all twenty of

each store's Project Insight slots were filled with needy children.  One of the

Performance Standards in the Vision Center District Manager Performance

Evaluation was "Achieves Project Insight goals."  Ex. WW, Turner Performance
Evaluation at 01888.

9.　　John Turner gave permission for the children of employees Nicole Pennock and
Susan Pendley to participate in Project Insight.  Ex. B, Black Dep. at 75:8-76:16; Ex.
A., Y. Loskot Dep. at 91:4-23, 93:15-94:6.

10.　　John Turner also gave permission for Yvonne Loskot's grandchildren to participate in
Project Insight, and they were signed up on November 8 and November 11, also at
the very end of the campaign period.  Ex. B, Black Dep. at 75:8-76:16; Ex. A., Y.
Loskot Dep. at 101:24-102:3; Ex. X, Order #1000237 BOSS Reports; Ex. Y, Order
#1000202 BOSS Reports; Ex. X, Order #1000237 BOSS Reports.

11.　　In 2005, Wal-Mart extended the Project Insight enrollment period.  Ex. UU, 2005
Project Insight Guidelines.

12.　　Neither Susan Pendley nor Nicole Pennock, two employees whose own children
received Project Insight services, were ever disciplined, talked to, or told that they
had improperly participated in the Project Insight program.  Ex. C, Bonora Dep. at
192:14-23; 193:7-20.

**C.　　When Pam Black Refused to Get Rid of Loskot, Turner Turned to Jeff Bonora**

13.　　In August 2005, Jeff Bonora called Pam Black into a closed-door meeting and told
her that she had failed to "protect company assests" during her management of a
barbeque fundraiser.  Ex. B, Black Dep. at 94:4-7, 95:9-12.

14.     Bonora interrogated Black about the fundraiser in a loud, confrontational manner, and
accused her of stealing from the company during the fundraiser.  Ex. B, Black Dep. at
96:1-6.

15.     Black had operated this fundraiser for years and handled everything the same way
every year and had received national recognition for this fundraiser in the past.  Ex.
B, Black Dep. at 93:17-94:9, 96:1-6. 93:17-94:9.

16.     Bonora told Black that if she signed a statement regarding the fundraiser that it would
be no big deal and that he would talk to the head office and that she would keep her
job.  Ex. B, Black Dep. at 107:8-13.

17.     Black signed the statement (though she recalls it being a different statement than the
one Wal-Mart has produced in this litigation), and almost immediately a police
officer walked into the room, placed Black under arrest, handcuffed her and walked
her out of the store in handcuffs.  Ex. B, Black Dep. at 102:21-103:23; 104:18-22;
107:14-20.

18.     Black was terminated.  Ex. B, Black Dep. 138:11-13.

19.     In September 2005, John Turner asked Jeff Bonora to begin investigating Yvonne
Loskot.  Ex. K, Bonora Stmt.

20.     Turner told Bonora that based on his review of various layaway trial balance reports,
he wanted Bonora to investigate certain transactions in the DeSoto Vision Center, and
he specifically told Bonora to look at Yvonne Loskot.  Ex. C, Bonora Dep. at 78:15-
79:2; Ex. S, Investigator On-Site Notes at 669 ("John [Turner] specifically mentioned
cp [Loskot] to Jeffrey [Bonora]….").

21.    Wal-Mart has destroyed all layaway trial balance reports that Turner reviewed and showed to Bonora and that Bonora relied on in the investigation of Loskot.  Ex. L, Wal-Mart's Response to EEOC's Requests for Admissions at #7.

22.    Turner and Bonora worked together in the Vision Center almost daily for two weeks after Pam Black's termination.  Ex. I, Hyslop Dep. at 43:2-45:12.

23.    Turner gave Bonora BOSS reports during the investigation.   Ex. O, Turner Dep. at 106:25-107:3.

24.    Turner gave Bonora information about Project Insight.   Ex. O, Turner Dep. at 116:19-117:20.

25.    Bonora informed Turner about the progress of his investigation, and included Turner, along with Store Manager Gary McClain, in the decision to terminate Loskot.  Ex. J, Bonora Affidavit; Ex. M, Wal-Mart's Responses to EEOC First Interrogatories #2.

26.    On October 3, 2005, Bonora called Loskot into a closed-door meeting with Gary McClain and Manager Leisha Layton.  Ex. K, Bonora's Stmt.

27.    When Loskot entered the room, Bonora asked if she needed a drink of water or if she needed to go to the bathroom before they got started.  Ex. Q, Loskot Declaration; Ex. A., Y. Loskot Dep. at 115:16-116:3.  Bonora's implication was that she would not be able to leave the room once the meeting started.

28.    Bonora then immediately began saying he wanted to "know if there's something going on in there [in the Vision Center] that you can tell me.  Tell me something." Ex. A, Y. Loskot Dep. at 109:11-15.

29.    Loskot asked Bonora what he wanted her to tell him, and he just said, "I just want to know what's going on in the vision department," refusing to tell her what his concerns were.  Ex. A, Y. Loskot Dep. at 109:16-18.

30.    Bonora had a folder with some papers in it, and he opened and closed the folder and flapped it around, but he never showed Loskot any of the papers he had.  Ex. A., Y. Loskot Dep. at 109:21-24, 122:24-123:3; Ex. Q, Loskot Declaration.

31.    Bonora asked Loskot if her grandchildren had used Project Insight services for her grandchildren, and Loskot said "yes", stating that John Turner had given permission for her grandchildren and other employees' children to use the services.  Ex. A., Y. Loskot Dep. at 109:23-110:7; Ex. K, Bonora Stmt.

32.    Bonora told Loskot, "I'll take you to court if you don't tell me something," and Loskot replied she didn't know what he wanted her to tell him.  Ex. A., Y. Loskot Dep. at 110:8-12.

33.    Bonora asked Loskot a few questions about an order for another Wal-Mart employee, Carol Crocker, but he did not ask her about any other orders for herself or other family members, aside from the Project Insight orders.  Ex. A, Y. Loskot 146:15-23.

34.    Bonora admits that he *never asked Loskot* about any of the particular orders he claims he was concerned about.  Ex. C, Bonora Dep. at 207:21-24,

35.    Loskot told Bonora that she had kept her receipts for her orders and purchases.  Ex. A, Y. Loskot 110:18-111:2

36.    Bonora told Loskot that she could go and that she should bring the receipts back to the store the next day.  Ex. A, Y. Loskot 110:18-111:2.

37.  When Loskot informed Bonora that the next day, October 4, was her day off, Bonora agreed to allow Loskot to bring in the documents on October 5.  Ex. A, Y. Loskot Dep. at 111:1-6.

38.  After her interrogation by Bonora, Yvonne Loskot was very upset and flustered.  Ex. A., Y. Loskot Dep. at 150:9-12; Ex. SS, E. Loskot Dep. at 35:15-21.

39.  Loskot went home and looked for any receipts or paperwork she could find related to her and her family's Vision Center orders.  Ex. A., Y. Loskot Dep. at 147:8-18.

40.  Bonora had not asked Loskot about any of Loskot's personal orders, but she was flustered by Bonora's threats to take her to court and she wanted to take him all the receipts she could find.  Ex. A., Y. Loskot Dep. at 147:15-148:18.

41.  On October 4, Loskot called her doctor's office and made an appointment for that day to be treated for the stress, anxiety and depression she was experiencing from her interrogation.  Ex. A., Y. Loskot Dep. at 149:10-151:1; Ex. SS, E. Loskot Dep. at 35:23-36:3.

42.  Loskot told her doctor about her experience at work the previous day, and the doctor diagnosed her with anxiety and hypertension and prescribed a strong medication that caused her to sleep.  Ex. A., Y. Loskot Dep. at 151:2-21.

43.  The doctor also told Loskot that she was under so much stress that she needed to take a leave of absence from work, and he signed a note and a leave of absence request form for her stating that she should not return to work for 30 days due to her anxiety and hypertension.  Ex. T, Doctor's Note; Ex. U, Leave of Absence Request; Ex. SS, E. Loskot Dep. at 35:23-36:3.

44.     Later that day, Loskot and her husband went to the Wal-Mart store to turn in the receipts she had found and for Loskot to submit a request for a sick leave.  Ex. A., Y. Loskot Dep. at 152:9-15; Ex. SS, E. Loskot Dep. at 36:17-37:14.

45.     Following Wal-Mart's procedure for requesting sick leave, Loskot took her leave request to her supervisor, who approved it, and then she took the approved request and an envelope containing all of the receipts she had found and left them in the main office for Store Manager Gary McClain.  Ex. V, Leave of Absence Policy at A00693-693 [Dep. Ex. 54]; Ex. U, Leave of Absence Request; Ex. A., Y. Loskot Dep. at 152:9-153:22; Ex. SS, E. Loskot Dep. at 36:17-37:14.

46.     The following day, October 5, Loskot was still suffering from anxiety and the side effects of the drugs prescribed by her physician.  Ex. A., Y. Loskot Dep. at 151:16-21.

47.     Loskot did not go to work because she was sick, heavily medicated, and her leave of absence request had been approved by her supervisor.  Ex. A, Y. Loskot Dep. at 170:19-171:4.

48.     Loskot received a call from Bonora on October 5, and he left a message on her answering machine, stating, "Yvonne, since you have chosen not to come in for our meeting, you will have to suffer the consequences."  Ex. SS, E. Loskot Dep. at 61:18-24; Ex. A, Y. Loskot Dep. at 171:5-17.

49.     Loskot was still sick and unable to talk to anyone, but her husband faxed a letter to Bonora and Gary McClain asking that any further communications from the store be in writing.  Ex. W, E. Loskot Fax to J. Bonora [Dep. Ex. 8].

50.   The next communication Loskot received from Wal-Mart was a letter from Bonora and McClain stating that her employment was terminated effective October 5, 2005. Ex. VV, TerminationLetter [Depo Ex. 10]; Ex. A., Y. Loskot Dep. at 184:12-14.

**D.      Age Was the Reason for Loskot's Termination**

51.   After Loskot's termination, the only employee remaining in the vision center who was over 40 years old was Cynthia Uhlinger, who, at age 48, was nineteen years younger than Yvonne Loskot.  Ex. R, Wal-Mart's Responses to EEOC's Third Interrogatories.

52.   Danielle Hyslop, age 23, Pamela Cape, age 26, and Melanie McKalip, age 18, also remained employed in the Vision Center after Loskot's termination.  Ex. R, Wal-Mart's Responses to EEOC's Third Interrogatories.

53.   Every employee hired or transferred to work in the Vision Center at Wal-Mart Store #152 (DeSoto) after Loskot's termination in October 2005 was 40 years old or younger:

- Julie Billingsley began working in the Vision Center in December 2005 at age 23;

- Timothy Stevens began working in the Vision Center in March 2006 at age 21;

- Angela Christopher began working in the Vision Center in July 2006 at age 40 (at $17.18 per hour);

- Anita Rumpsa began working in the Vision Center in August 2006 at age 38;

- Sabrina Dierks began working in the Vision Center in September 2006 at age 19.

Ex. R, Wal-Mart's Responses to EEOC's Third Interrogatories.

54.    Wal-Mart admits that John Turner was involved in the decision to terminate Yvonne Loskot.  Ex. M, Wal-Mart's Response to EEOC's First Interrogatories #2

**E.    Wal-Mart's other explanations for Loskot's termination are shifting and have legitimate explanations.**

55.    Wal-Mart has said that the reason for Loskot's termination was Project Insight.  Ex. M, Wal-Mart's Response to EEOC's First Interrogatories #3 (referring only to Project Insight transactions).

56.    On October 12, 2005, Bonora prepared documents to seek restitution from Loskot, and the "total restitution owed" is $198, the same as the total value of the Project Insight services.  Ex. C, Bonora Dep. at 325:5-326:1, 332:14-333:8, 331:8-15; Ex. PP, ROAR Documentation [Dep. Ex. 52] at A00710.

57.    The total value of the Project Insight services received by Loskot's grandchildren was also $198.  Ex. X, Order #1000237 BOSS Reports (showing services valued at $38); Ex. Y, Order #1000202 BOSS Reports (showing services valued at $38); Ex. X, Order #1000237 BOSS Reports (showing services valued at $122).

58.    Wal-Mart told the Missouri Division of Employment Security twice that it terminated Loskot because of transactions related to Project Insight.  No other transactions or allegations of theft were referenced.   Ex. N, Div. of Emp. Security File at 37 and 51.

59.   Halfway through the EEOC's investigation of Loskot's Charge of Discrimination,
      Wal-Mart changed its tune on Project Insight, admitting that it was not a problem for
      Loskot's grandchildren to use the services if they were otherwise eligible, and
      suddenly began raising other transactions as the reason for Loskot's discharge.
      *Compare* Ex. QQ, Wal-Mart's 8/9/06 EEOC Position Statement (referring only to
      Project Insight as the reason for Loskot's termination), *with* Ex. RR, Wal-Mart's
      9/5/07 Response to Request for Information (attaching a long list of "problem"
      transactions) *and* Ex. S, Investigator 11/29/07 On-Site Notes at 672 (Bonora states
      that Project Insight "was not even a 10th of the problem").

60.   Every transaction questioned by Bonora has an explanation that Bonora himself could
      have discovered if he had conducted a thorough investigation.  Order # 1000237 for
      granddaughter A. B. dated 11/11/04 was clearly marked "Project Insight", and
      Yvonne Loskot immediately admitted to Bonora during his interrogation that three of
      her grandchildren had received Project Insight services with John Turner's
      permission.  Ex. X, Order #1000237 BOSS Reports; Ex. K, Bonora Stmt.

61.   Order # 1000202 for Michelle Burg dated 11/8/04 was also clearly marked "Project
      Insight".  Ex. Y, Order #1000202 BOSS Reports.

62.   Order # 1000238 for Anthony Burg dated 11/11/04 was also clearly marked "Project
      Insight".  Ex. X, Order #1000237 BOSS Reports.

63.   Although Bonora claimed that Anthony Burg was Loskot's brother (based on an
      incorrect birthdate of 1954 in the BOSS system), only a little bit of investigative work
      would have revealed that a patient named Tony Burg had the same home phone
      number as Anthony, resided in Blackwell, MO (as did Anthony), and had a birthdate

of 1958, suggesting, at the very least, Anthony's identity was unclear and that perhaps further investigation was warranted.  Ex. X, Order #1000237 BOSS Reports & Supporting Documents.

64.     Moreover, it is unclear when or how Anthony Burg's birthdate was changed in the BOSS system, because a Vision Center order from 10/16/2003 shows that Anthony Burg is a minor.  Ex. X, Order #1000237 BOSS Reports & Supporting Documents at EEOC 00787.

65.     Order #s 1115225, 1119801 and 1119805 for Heather Burg from 1996 and 1997 were almost a decade old by the time Bonora reviewed them, and even Bonora admitted that they were not of concern to him.  Ex. Z, Order #s 1115225, 1119801 and 1119805 BOSS Reports; Ex. C, Bonora Dep. at 247:25-248:12.

66.     Order # 1001189 for Tony Burg dated 2/17/05 was for a pair of gray polarized lenses at $27.50 each and a $94 Stetson frame (prescription sunglasses).  Ex. AA, Order # 1001189 BOSS Report & Supporting Documents.

67.     Bonora questioned the employee discount applied to this transaction, but Loskot's receipt and credit card statement show that she, not her son, paid for the services.  Ex. AA, Order # 1001189 BOSS Report & Supporting Documents.

68.     Bonora admits that Loskot was entitled to use her employee discount for any products or services she purchased at Wal-Mart, even if they were gifts for her relatives.  Ex. C, Bonora Dep. at 275:8-19.

69.     Order # 1001189 was based on a prescription written just two weeks earlier, on 1/29/05, and Loskot produced a receipt for that exam, a frame, and pair of lenses

purchased on 2/18/05.  Ex. AA, Order # 1001189 BOSS Report & Supporting

Documents at EEOC 00846B.  Bonora also noted that there was a refund associated

with this order, which is explained in association with Order # 1002056 below.

70.     Order # 1001538 for Tony Burg dated 3/19/05 is a remake of the 1/29/05 order for a

frame and lenses.  The BOSS system notes that it is a rush job, and it is for a pair of

clear Flat Top 35 Clear (regular bifocal lenses) at $22.50 each and the same $94

Stetson frame purchased on 1/29/05.  As a remake of a pair of glasses that was

already paid for on 1/29/05, no additional receipt would be expected.  Ex. BB, Order

# 1001538 BOSS Report.

71.     Order # 1002056 for Tony Burg dated 5/7/05 was for a remake of the lenses from

Order # 1001189, replacing the $27.50 lenses with $40 bifocal polarized lenses.  Ex.

CC, Order # 1002056 BOSS Report & Supporting Documents.

72.     The BOSS system shows that the order was ready on 5/13/05, and Loskot's receipt

shows that she paid for the more expensive lenses on 5/14/05.  The frame remained

the same, and would not have been refunded or paid for again.  Ex. CC, Order #

1002056 BOSS Report & Supporting Documents.

73.     Order # 1173656 for Yvonne Loskot dated 3/16/02 shows in the BOSS system that

there was a sale of $86.38 and two payments of $43.19 each on 3/16/02 and 4/17/02,

for a complete payment of $86.38.  Ex. DD, Order # 1173656 BOSS Report &

Supporting Documents.

74.     Loskot's own credit card statements suggest that these payments were made, showing

a $43.19 charge at the Festus Wal-Mart on 3/16/02 and multiple additional charges at

the Festus Wal-Mart on 4/21/02 which, if combined with other purchases, could have included the $43.19 payment.  Ex. DD, Order # 1173656 BOSS Report & Supporting Documents.

75.     Order # 1190213 for Yvonne Loskot dated 8/6/03 shows in BOSS system that this order for $54.84 was fully paid for.  Ex. EE, Order # 1190213 BOSS Report.

76.     Order #1191544 for Yvonne Loskot dated 9/13/03 was a remake of Order # 1190213, but for a more expensive pair of glasses.  Loskot's receipt shows that she paid the difference in price, $34.14, on 9/13/03, and she even made a handwritten note on the receipt that this order was in tray # 1080.  Ex. FF, Order # 1191544 BOSS Report & Supporting Documents.

77.     Order # 1192798 for Yvonne Loskot dated 10/25/03 shows in the BOSS system that the order was cancelled, so no payment would be expected.  Ex. GG, Order # 1192798 BOSS Report.

78.     Order # 1005154 for Yvonne Loskot dated 8/21/04 shows in the BOSS system that the order was cancelled, so no payment would be expected.  Ex. HH, Order # 1005154 BOSS Report.

79.     Order # 1005155 for Yvonne Loskot dated 8/21/04  shows in the BOSS system that the order was cancelled, so no payment would be expected.  Ex. II, Order # 1005155 BOSS Report.

80.     Order # 1005156 for Yvonne Loskot dated 8/21/04 shows in the BOSS system that this order was paid for on 8/23/04, and Loskot's receipts confirm her payment.  Ex. JJ, Order # 1005156 BOSS Report & Supporting Documents_.

81.     Order # 1001049 for Yvonne Loskot dated 2/5/05 shows in the BOSS system that

        Pam Black noted that this order was a remake from an order originally taken in

        Deslonge, apparently Order # 1005156 from less than six months before, and it was a

        remake of the lenses only (no frame was ordered).  Ex. KK, Order # 1001049 BOSS

        Report.

82.     Loskot does not have a clear, independent recollection of Order # 1193112 dated

        11/5/03 and Order #1001965 dated 11/19/03, but she knows that she would have paid

        for them if any payment was due.  Ex. Q, Loskot Declaration; Ex. NN, Order #

        1193112 BOSS Report; Ex. LL, Order # 1001965 BOSS Report.

83.     John Turner testified that Yvonne Loskot did a very good job as an optician.   Ex. O,

        Turner Dep. at 48:11-49:4.

84.     Remakes are often due to an optician's error.  Ex. B, Black Dep. at 32:11-20.

85.     Yvonne Loskot's Operator ID number, which appears on every sales receipt rung up

        by a Wal-Mart employee, was 1670.  Ex. C, Bonora Dep. at 146:1-21; Ex. XX, Wal-

        Mart's Response to EEOC's Second Interrogatories.

86.     Wal-Mart has not produced any receipts showing that Yvonne Loskot rung up her

        own purchases or those of her family members.


                        BARBARA A. SEELY  ARN 10607
                        Regional Attorney
                        EQUAL EMPLOYMENT OPPORTUNITY
                        COMMISSION
                        St. Louis District Office
                        1222 Spruce St., Rm. 8.100
                        St. Louis, MO 63103
                        (314) 539-7910 (telephone)

(314-539-7895 (facsimile)
barbara.seely@eeoc.gov

/s/ Andrea G. Baran
ANDREA G. BARAN  MO #46520
Senior Trial Attorney
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION
400 State Avenue, Suite 905
Kansas City, Kansas 66101
(913) 551-5848 (telephone)
(913) 551-6957 (facsimile)
e-mail: barbara.seely @eeoc.gov
            andrea.baran@eeoc.gov

ATTORNEYS FOR PLAINTIFF
EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION

## CERTIFICATE OF SERVICE

A copy of the foregoing was served via the Court's CM/ECF system on October 21,

2009, to:

James F. Bennett
jbennett@dowdbennett.com

Erika M. Anderson
eanderson@dowdbennett.com

Jennifer L. Aspinall
jaspinall@dowdbennett.com

/s/ Andrea G. Baran
Attorney for Plaintiff